UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA
------------------------------------------------------------x

HUDA FAKHREDDINE,
TROUTT POWELL, and PENN
FACULTY FOR JUSTICE IN PALESTINE,

                               Plaintiffs,                        **COMPLAINT**

     -against-

THE UNIVERSITY OF PENNSYLVANIA,

                               Defendants,

------------------------------------------------------------x

      Plaintiffs Huda Fakhreddine, Troutt Powell, and Penn Faculty for Justice in Palestine, plaintiffs, for their complaint against the defendant University of Pennsylvania ("Penn") allege as follows:

## PRELIMINARY STATEMENT

(1)    This nation is seeing the advent of a new form of McCarthyism, in which accusations of anti-Semitism are substituted for the insinuations of Communist leanings which were the tool of oppression in the 1950's.

(2)    The House Committee on Education and the Workforce (the "Committee") has eagerly assumed the role of the House Unamerican Activities Committee of old ("HUAC"). On December 5, 2023, the Presidents of the University of Pennsylvania, Harvard, and MIT were called before the Committee and asked questions which were intentionally phrased to place them in a false light as to their actions to combat anti-Semitism. This bad faith questioning was so effective that two of the three presidents have since been forced to resign, including Elizabeth Magill of Penn.

(3)     The Committee has eagerly joined billionaire donors, pro-Israel groups, other litigants, and segments of the media in accusing Penn of being a pervasively anti-Semitic environment (which it is not) — but to advance this narrative, every one of these participants in the hue-and-cry, including the Committee, have asserted that anti-Zionism, and in fact virtually any criticism of the state of Israel, is anti-Semitism.

(4)     Criticisms of the nation-state, Israel, including statements of anti-Zionism, are First Amendment-protected speech. The new McCarthyism has, since long before October 7, been highly successful at getting individuals fired from jobs, expelled or suspended from universities, denied tenure or advancement, demoted from prominent media roles, and dropped by entertainment agents, as well as successfully obtaining the rescission of offers of employment, and of invitations to participate in conferences and workshops, speaking engagements and numerous other opportunities. This new McCarthyism, which was growing slowly before the Hamas atrocities on October 7, 2023, but is surging up very rapidly now, has already been hugely successful at ending careers and blighting lives, just like its predecessor.

(5)     Individual plaintiffs are tenured Penn professors who have been threatened, accused, and doxxed for the subject matter they teach, and their First Amendment protected criticism of Israel and their advocacy for Palestinians and the people of Gaza. Neither of them is an anti-Semite, but both have been falsely accused of bias towards Jews.

(6)     Plaintiff Fakhreddine is an Arab American who additionally has been reviled for her national origin and ethnicity. Two members of the Committee, relying uncritically and likely maliciously on false narratives, mentioned her by name on national television during the hearing, asking why she was still employed at Penn.

(7)     The Committee first sent a letter to Penn demanding the production of many

categories of information, including private FERPA-protected student files and documents pertaining to an annual scholarly event produced by plaintiff Fakhreddine focusing on Palestinian literature. Since this was not a subpoena but a letter requesting voluntary compliance, Penn would have been within its rights to protect its community by refusing compliance. Instead, Penn, its trustees off balance and frightened by the accusations of anti-Semitism, announced it would comply with the Committee's letter, and, on information and belief, has begun producing documents.

(8)     Penn's compliance with the Committee's letter threatens the privacy, safety, academic freedom and careers of the individual plaintiffs and of many other members of the Penn Faculty for Justice in Palestine.

## THE PARTIES

(9)     Plaintiff Huda Fakhreddine, a professor at Penn, is a leading scholar of Arabic literature, whose work focuses on modernist movements or trends in Arabic poetry and their relationship to the Arabic literary tradition.

(10)     Plaintiff Troutt Powell is a professor of History and Africana Studies at Penn, and a former President of the Middle East Studies Association.

(11)     Plaintiff Penn Faculty for Justice in Palestine ("PFJP") is a collective of faculty, students, staff, researchers, and graduate employees at the University of Pennsylvania who support Palestinian human rights and liberation from Israeli occupation.

(12)     The University of Pennsylvania is a private university, also known as the Trustees of the University of Pennsylvania, which is organized under the laws of Pennsylvania and located in Philadelphia, Pennsylvania.

## JURISDICTION AND VENUE

(13)     This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

(14)     This Court has personal jurisdiction over Penn because it is based and operates in Philadelphia, Pennsylvania.

(15)     Venue in this District is proper under 28 U.S.C. § 1391 because it is the judicial district in which a substantial part of the events or omissions giving rise to plaintiffs' claims occurred and where Penn is located.

## THE FACTS

## A COMMENT ON ANTI-SEMITISM

(16)     Plaintiffs know there is real anti-Semitism in the world; some Jewish members of PFJP have experienced it personally.

(17)     This action is not about *real* anti-Semitism (despite the fact that many hateful statements against all races, ethnicities, nationalities and religion are in fact also First Amendment protected per our Supreme Court).

(18)     This action instead concerns the McCarthyesque use of a vague, overbroad, patently unconstitutional definition, which is termed "anti-Semitism" in egregious ontological error, to chill, punish and end virtually all moral, political, legal, and other criticism of the nation-state Israel.

## THE HOUSE OF REPRESENTATIVES

(19)     Congress is a state actor directly governed and limited by the First Amendment.

(20)     While Congress is permitted under certain circumstances to exempt itself from the application of certain laws it enacts, or to waive their applicability under specific circumstances, Congress may not, ever, avoid the strictures imposed on it by the First Amendment.

4

(21)   When it comes to allegations of anti-Semitism, however, the would-be McCarthyesque House of Representatives is behaving as if it never heard of the First Amendment.

(22)   On December 5, 2023, the House passed Resolution 894 on anti-Semitism, which contains two statements which express a patent intention to violate the First Amendment rights of Americans:

(23)   The first is a "Whereas" clause, "Whereas the International Holocaust Remembrance Alliance's working definition of antisemitism is widely accepted".

(24)   The International Holocaust Remembrance Alliance ("IHRA"), discussed in more detail below, is an NGO which proposed its own private speech code, never intended to be enacted into law.

(25)   The IHRA standards if legislated would patently violate the First Amendment; for example, they define as anti-Semitism the comparison of Israelis with Nazis, or the questioning of the right to a Jewish homeland, and even holding Israel to higher moral standards than other nations-- all of which, even if phrased in an upsetting, unpleasant way, are clearly political expression protected by the First Amendment.

(26)   Another statement in the resolution which is even more starkly violative of the First Amendment occurs near the end: "resolved, that the House of Representatives....clearly and firmly states that anti-Zionism is antisemitism".

(27)   This grammatical English sentence is actually as ontologically, and even epistemologically absurd, as if the House resolved that Pi is 7.87 instead of 3.14, or that bananas are vegetables.

(28)   Zionism is a political ideology held by some Jewish people which includes both pragmatic, political and some asserted faith-based elements.

(29)   Many of the founders of Zionism and, later, of the Israeli state, were secular individuals, such as Theodor Herzl, for whom the Old Testament and religious justifications had nothing to do with their desire to establish a Jewish state.

(30)   Today, there are numerous Jewish people in America, and through-out the world, who are not Zionists, and some of whom actively and publicly criticize Zionism.

(31)   For example, there are groups of Hasidic Jews who consider themselves anti-Zionist and who even participate in pro-Palestinian demonstrations.

(32)   Also, many members of Reform Judaism are not Zionists, and criticize the actions of the Israeli state towards Palestinians.

(33)   Many other Jewish intellectuals, writers and critics have rejected an "Israel right or wrong" attitude and have publicly criticized Israel's treatment of Palestinians.

(34)   The militant minority which believes that Israel can do no wrong, even when it drops 2,000-pound bombs on civilian areas, destroying 80% of housing, hospitals, schools and universities, and kills thousands of children, has no trouble categorizing Jews criticizing Israel as anti-Semitic themselves, self-hating, disturbed, marginal, and not really Jews.

(35)   The House is in fact privileging a minority of the American Jewish population, not only over Arab Americans and all others criticizing Israel or supporting Palestinians-- the House is in fact privileging this militant minority over all Jewish Americans who do not share their views.

(36)   In its actions, the House is committing two textbook violations of the First Amendment, retaliation, and viewpoint discrimination.

(37)   The House is, exactly as HUAC did in the 1950's, reaching out to chill, threaten and punish Americans whose views it disapproves.

(38)    It is also taking sides by promoting pro-Israeli political speech over pro-Palestinian political speech, though both are First Amendment-protected.

(39)    It is hornbook law that even a Congressional subpoena, which the Information letter is not, must serve a legitimate legislative purpose.

(40)    Since the House cannot pass legislation stating that anti-Zionism is anti-Semitism or excluding criticism of Israel from the coverage of the First Amendment, the Information Letter serves no legitimate congressional purpose.

## THE COMMITTEE

(41)    The Committee is eagerly assuming the McCarthyesque role played by HUAC in the 1950's.

(42)    The Committee's adoption of the unconstitutional IHRA standards and of the improper and untenable proposition that anti-Zionism equals anti-Semitism, its eager use of information letters to seek confidential information on students in violation of the FERPA laws, its unsavory interaction with doxxing sites, its apparent interest in exposure of its targets to harm and censure (making the Committee a doxxing site itself) and its lack of any authorization from the House to issue information letters or subpoenas on this topic, all characterize it as  a "rogue committee", off on an illegitimate and malicious mission of its own.

(43)    The Committee summoned President Elizabeth Magill of Penn to appear before it "voluntarily" on December 5, 2023, along with the Presidents of Harvard and MIT.

(44)    Magill duly appeared as requested, answering the Committee members' malicious, insinuating, trick questions, many of which were based on the assumption that any political criticism of Israel is anti-Semitic.

(45)    Magill, asked whether such speech violated Penn's student code of conduct,

answered that such a determination would be "context dependent".

(46)   This was in fact a good faith and honorable answer pursuant to the First Amendment and Penn's commitments regarding academic freedom.

(47)   However, the Committee in effect doxxed Magill, accusing her falsely of anti-Semitism, and bringing about a barrage of other voices demanding her resignation, including powerful billionaire donors holding right wing and pro-Israel views.

(48)   Just four days later,  Magill, unable to withstand this doxxing and relentless, hateful pressure, and unprotected by Penn's trustees, resigned as President of Penn.

(49)   At the December 5 hearing, Committee member Joe Wilson of South Carolina, delivering an exemplary and enthusiastic McCarthyesque performance, demanded that Magill inform him what percentage of Penn professors are conservatives, concluded that the answer was "zero", blasted diversity, equity and inclusion,  finally naming plaintiff Fakhreddine, to whom he has never spoken, but only received false and hateful doxxing "information", and asking, "How are Jewish students in Fakhreddine's classes supposed to receive fair treatment when she endorses hatred?"

(50)   By the way, Wilson's use of the anti-Semitism trope to attack diversity on campus is very common on the far right today, and evocative of how the weaponized concept has little or nothing to do with the protection of Jewish Americans.

(51)   Wilson thanked a "really wonderful" Penn student for providing him with the doxxing "information", on information and belief Eyal Yakoby (see below).

(52)   At the same hearing, Committee member Jim Banks of  Indiana, in another exemplary McCarthyist performance, after asking Magill why she invited anti-Semites to the Palestinian Writes Festival (which she personally did not), cast doubt on whether she had issued a

condemnation of anti-Semitism, claiming he hadn't been able to find it, then demanded to know why Plaintiff Fakhreddine "still [has] a job at your university".

(53)    On January 24, 2024, the Committee sent a letter to Penn (the "Information Letter"), demanding that it produce by February 7, sixteen categories of documents, including certain requests with ten or eleven subcategories, including "findings and results of any disciplinary processes" pertaining to faculty and students; "sources of funding" for and "activities" of student groups at Penn critical of Israel and supporting the Palestinian people; "the Palestine Writes Literature Festival"; "anti-Israel protests"; posts on Penn social media about "Israel, Zionists and Zionism"; and numerous other First Amendment-protected speech which is not even slightly anti-Semitic in any way.

(54)    The Information Letter mentions Plaintiff Fakhreddine by name, accusing her of anti-Semitism.

(55)    Although the Information Letter is not a subpoena and has no legal compulsory effect, so that Penn would have been within its rights to protect the academic freedom and privacy of its community by refusing compliance, Penn has already begun producing documents in response.

(56)    Famous words uttered about HUAC are of equal import today as applied to the Committee. Justice Hugo Black, dissenting in *Braden v. United States,* 365 U.S. 431, 444 (1961), wrote of the conviction of a civil rights activist for refusing to answer questions when subpoenaed before HUAC: "The very foundation of a true democracy and the foundation upon which this Nation was built is the fact that government is responsive to the views of its citizens, and no nation can continue to exist on such a foundation unless its citizens are wholly free to speak out fearlessly for or against their officials and their laws. When it begins to send its dissenters....to jail, the

liberties indispensable to its existence must be fast disappearing".

(57)     Martin Luther King then commented on *Braden*, endorsing Justice Black's dissent*:* "[I]f the Committee [HUAC] has unlimited powers it will misuse them. Braden was called before the Committee simply for his integration activities. We think that if the Un-American Activities Committee is to have the power to subpoena everyone, they will misuse the power to stand in the way of integration."

(58)     What today's Committee is doing is identical: it is rooting out, penalizing and will soon criminalize certain First Amendment-protected speech its members detest.

### JAKOBY v. PENN

(59)     Another tactic in the "social engineering" movement to repeal the First Amendment as far as speech critical of Israel is concerned, is the bringing of lawsuits against universities claiming they are pervasively hostile anti-Semitic environments; invoking the IHRA standards; and then unself-consciously listing many obviously First Amendment protected expressions as evidence of anti-Semitism.

(60)     *Yakoby v. University of Pennsylvania,* 23-cv-04789, filed on December 5, 2023, here in the Eastern District, is a textbook example.

(61)     The Complaint begins: "Penn, the historic 300-year-old Ivy League university, has transformed itself into an incubation lab for virulent anti-Jewish hatred, harassment, and discrimination".

(62)     The IHRA standards are invoked in detail at paragraphs 21 to 23.

(63)     Plaintiffs then unambiguously declare, advancing their patently unconstitutional argument, that "Anti-Zionism, therefore, is inherently and necessarily discriminatory and antisemitic".

(64)    This is in fact the core and cornerstone of the Yakoby Complaint.

(65)    Although the parties in *Yakoby* are of course private individuals and entities not governed by the First Amendment, the constitutional issue is nonetheless implicated because the plaintiffs are asking the court to declare the IHRA standards the law of the land.

(66)    The Court cannot issue the requested relief, because the Court itself is a state actor governed by the First Amendment.

(67)    The Complaint with no sense of awareness (or a reckless disregard) of the First Amendment lists many examples of protected pure speech as evidence of anti-Semitism.

(68)    The "Palestine Writes Literature Festival," held at Penn last September, co-organized by Plaintiff Fakhreddine and co-sponsored by several Penn departments and programs, is described as "an anti-Jewish hatefest" (paragraph 4).

(69)    Paragraph 6 states: "The antisemitic speakers at the festival lived up to their reputations, inveighing against 'Jewish supremacism' and the 'messianic mindset' of 'religious Jews' who are willing to 'put up with anything to take over more land'."

(70)    Yet mainstream American media such as the New York Times have routinely reported on statements made by Israeli cabinet members who belong to the far-right parties in the coalition the Prime Minister assembled, stating that Palestinians are "human animals", calling for the re-taking of Gaza as a Jewish settlement, and invoking the language of the Old Testament in justification.

(71)    Other examples of protected speech presented as anti-Semitism are given every few paragraphs, for example in paragraph 57: "In March 2015, for example, eight student groups—including the Penn Arab Student Society, Penn for Immigrant Rights, Penn Students for Justice in Palestine, Students Organizing for Unity and Liberation, Penn Amnesty International, Penn Non-

Cis, and the Student Labor Action Project—announced 'Penn Divest from Displacement,' a proposal that the University divest from corporations profiting from 'displacement' around the world.  While this proposal purported to address the problem of 'displacement' globally, most of the movement's identified companies were targeted only because of their connection to Israel".

(72)   Arguing that universities should divest from companies which manufacture weapons for Israel or support illegal settlements on Palestinian land is, however repugnant to the *Yakoby* plaintiffs, protected political and moral speech entirely consistent with calls to divest (often made by the same people) from companies manufacturing weapons for use in other theaters of war.

(73)   The *Yakoby* complaint also asserts: "In October 2015, Professor John L. Jackson, then Dean of Penn's School of Social Policy and Practice and the current Provost at Penn, co-authored a report for the American Anthropological Association... recommending a boycott of Israel, alone among all of the world's countries, that led to an AAA resolution being introduced to AAA's membership to boycott Israeli academic institutions".

(74)   The Supreme Court in the *NAACP* case upheld a boycott of racist white merchants in a Southern city, and the boycott of South Africa was a popular cause with widespread support, until apartheid ended in that nation.

(75)   The *Yakoby* plaintiffs ask the Court to engage in patently unconstitutional viewpoint discrimination by finding, in effect, that boycotts against racism and apartheid are "good" boycotts, but that a boycott directed at the Israeli treatment of Palestinians is a "bad" boycott.

(76)   The Yakoby plaintiffs also allege: "On February 10, 2016, The Daily Pennsylvanian, Penn's student-run newspaper, ran an article not only accusing Israel of 'institutionalized racism and apartheid,' but vilifying the Penn Jewish community as well, claiming

that for many Jewish students, 'the presentation of facts regarding oppression and state-sponsored violence can be hard to swallow.'  The article accused the Jewish community of rejecting 'dialogue, "substantive facts" and a nonpropagandized setting' in favor of only 'homogenous' conversation" (paragraph 59)-- and yet it would appear the *Yakoby* plaintiffs are trying to use the Court to do exactly that, to homogenize the conversation.

(77)   "Several months later, in April 2016, various student groups, including Penn's chapter of Students for Justice in Palestine...—an anti-Zionist student group then formally recognized by Penn and a chapter of the national Students for Justice in Palestine—organized events for its first annual 'Israeli Apartheid Week.'  Israeli Apartheid Week is an annual program organized by anti-Israel activists in cities across the globe, focused on support for the Boycott, Divestment, Sanctions movement ('BDS') and vociferous slander of Israel as a 'racist,' 'apartheid' state.  For instance, as part of the 2016 Israeli Apartheid Week programming, SJP erected an 'Apartheid Wall,' meant to evoke the Israeli-West Bank barrier, built by Israel in the wake of suicide bombings and other attacks originating within the West Bank during the Second Intifada.  SJP's 'Apartheid Wall' accused Israel of segregation and violations of international law" (*Yakoby* complaint, paragraph 60).

(78)   This extraordinary paragraph contains a sort of "tell", the words "built by Israel in the wake of suicide bombings and other attacks". The Court is being asked to intervene to find an opinion inherently correct, that building the wall was a necessary act of self-defense, and to punish another viewpoint, that there were other motives for the wall.

(79)   Yakoby in fact asks the Court to adopt his own Israel right-or-wrong views-- but that would be a classic and egregiously unconstitutional act of viewpoint discrimination.

(80)   The complaint further states: "In April 2017, Penn's SJP held its second annual

Israeli Apartheid Week. Lauding the event, SJP's president emphasized that '[w]e make it very clear that we're antiZionism, which is the political ideology of an ethnocentric . . . State of Israel[.]' To that end, SJP held several antisemitic events, including 'Solidarity in the Face of Apartheid,' which accused both Israel and the U.S. of apartheid, and 'Christians in Palestine,' which falsely charged that Palestinian Christians are 'victims of the Israeli Occupation' and 'victims being forced to flee from their historical homeland.'" (*Yakoby* paragraph 62)

(81)    Here it could not be more obvious that Yakoby is offering an instance of pure speech, pure political opinion about the state of Israel, as discrimination.

(82)    This phrase also contains a "tell", the use of the word "false"; Yakoby asks the Court, not to decide that the assertions about Palestinian Christians are false, but to assume so based on Plaintiffs' word as a premise-- a decision which Justice Holmes said should be entrusted to the marketplace of ideas.

(83)    The *Yakoby* complaint offers numerous other instances of pure political speech demonized as anti-Semitism, too many others to list here.

(84)    The Plaintiffs in this action will move to consolidate *Yakoby* with the instant case, as both turn on the same mixed question of law and fact-- the definition of anti-Semitism which the government may impose on Penn.

### A THOUGHT ABOUT THE ESTABLISHMENT CLAUSE

(85)    Three religions, Judaism, Islam and Christianity, have each formulated a faith-based claim to the Holy Land.

(86)    Yakoby says at paragraphs 23 and 24 of the complaint: "As the historical birthplace of the Jewish people, the land of Israel is at the core of Jewish identity, ancestral tradition, religion, and culture... Zionism is the movement for the reestablishment, development, and protection of

the Jewish nation in the land of Israel and arises from the Jewish people's ethnic and historic roots in the land of Israel and the right of the Jewish people, like any other people, to self determination".

(87)    The Court, if it were to decide that anti-Zionism is anti-Semitism, would not only be infringing the speech and association clauses of the First Amendment, but also the establishment clause, by privileging one faith-based claim to the Holy Land over the others.

### THE IHRA STANDARDS

(88)    IHRA, a NGO founded in 1998, describes itself as deploying a "network of trusted experts [who] share their knowledge on early warning signs of present-day genocide and education on the Holocaust. This knowledge supports policymakers and educational multipliers in their efforts to develop effective curricula, and it informs government officials and NGOs active in global initiatives for genocide prevention". https://www.holocaustremembrance.com/about-us

(89)    The IHRA on its web site defines its standards as a "non-legally binding working definition". It also specifies that "criticism of Israel similar to that leveled against any other country cannot be regarded as antisemitic". https://www.holocaustremembrance.com/resources/working-definitions-charters/working-definition-antisemitism

(90)    Kenneth Stern, one of the drafters of the IHRA Standards, has since said: "It's not the definition that's the problem. It's the abuse of it....There was never any idea that this would be used as a de facto hate speech code on campus....[I]t sets up a system in which administrators have a reason to either condemn or try to suppress pro-Palestinian speech because their job is to keep the university from being sued under Title VI....A lot of this comes to whether anti-Zionism is anti-Semitism or not.... I don't like government putting its thumb on the scales inside of a debate inside the Jewish community....Do I think it's going to chill speech? Yeah, and I think that's the purpose. " Eric Cortelessa, "The scholar who wrote the definition of anti-Semitism says it's been

subverted", January 9, 2020 https://www.timesofisrael.com/the-scholar-who-wrote-the-definition-of-anti-semitism-says-its-been-subverted/

### THE IMPACT ON PLAINTIFFS

(91)    The relentless characterization of the individual Plaintiffs and members of the PFJP as anti-Semitic (which they are not) has already, in addition to the hatred expressed against them, also created an environment of profound danger, fear and distrust, in which it is impossible to enjoy any semblance of academic freedom.

(92)    Plaintiffs have been doxxed on sites like the anonymous and hateful Canary Mission, and have received death threats, threats of violence, and hate speech directed at their nationality, ethnicity, gender, religion, and beliefs.

(93)    Plaintiff Fakhreddine has been excluded from faculty meetings, her emails to the members of her department censored, and co-sponsorship of events canceled.

(94)    Plaintiff Powell has been doxxed, placed on the Canary Mission website because of her involvement in pro-Palestinian protests, and has received hundreds of threatening and hateful emails.

(95)    Professors, at Penn and nationwide, are left wondering whether it is any longer safe to teach courses about the history of colonialism, or to present a nuanced view in a classroom of the history of the Middle East.

(96)    There has not been such a grotesque limitation on academic freedom since the McCarthy era.

(97)     The Committee's relentless attack on academic freedom at Penn is in fact consistent with other declared goals of the Congresspeople involved and their party, to eliminate diversity, equity, and inclusion and all "woke" ideas in higher education.

16

(98)    As an idea of "Communism" was in the McCarthy era, so is "anti-Semitism" being used today, as a crowbar to break through many doors.

## DOXXING AND THE NEW MCCARTHYISM

(99)    There is a direct, diseased relationship between the Committee's operations and the Internet practice of "doxxing", in that the Committee  has already utilized false information from doxxing sites in its work (for example, the allegations made against plaintiff Fakhreddine by two congressfolk)-- and the likelihood that the confidential information about members of the academic community disclosed pursuant to the Information Letter by Penn will lead to the immediate doxxing by Canary Mission and other hateful sites of  the students and faculty named.

(100)   In the history of technology, there have been numerous instances of new, important means of expressions and communication which legislatures and courts took decades to understand.

(101)   For example, copyright laws were originally held inapplicable to movies and music performed on player pianos; the First Amendment likewise was held inapplicable to film; case-law early in the history of the Internet struggled with questions such as whether emails were writings, or whether the First Amendment applied to content posted on web sites.

(102)   Doxxing via social media is another technology development to which the laws and courts have not yet caught up.

(103)   Doxxing is a "social engineering" tactic in which a targeted individual is exposed to unwelcome mass attention, with the aim of getting them fired from a job, expelled from a university, denied opportunities to speak or write, and ostracized socially.

(104)   The allegations made against them are often entirely false, such as the accusations of anti -Semitism made against Plaintiffs herein.

(105)   Doxxing sites usually also offer the public the target's name, address, and other affiliations such as employer or university-- and specifically call upon users to contact them.

(106)   The intent of the doxxers is to encourage anonymous followers of the sites, many of them apparently sociopathic, to barrage the targeted individual with death and rape threats and hate speech, and also to contact their bosses, co-workers, and families.

(107)   Doxxing sites often include highly edited videos or screenshots taken completely out of context, to create false versions of the target's opinions or relationship to events, as well as subtitles making sweeping, false assertions, such as a claim the individual supports murder, rape and terrorism.

(108)   Doxxing as social engineering is not even limited to activist targets; individuals with no involvement in advocacy or protest have been fired from their jobs after a single social media post criticizing Israel or expressing compassion for the people of Gaza.

(109)   Courts in their bewilderment about doxxing have sometimes reached the conclusion that calling someone an anti-Semite online is a mere nondefamatory expression of opinion protected by the First Amendment, missing the huge element of intentional tortious harm inflicted on the victim.

(110)   Doxxers, to the contrary, are using the new technologies of social media to do indirectly what they could not do directly: they cannot legally issue true threats against their targets, but by doxxing them they knowingly and solicit anonymous followers to do so.

(111)   When the courts catch up to the realities of doxxing, they should hold it to be tortious, the intentional infliction of serious harm on the targeted person.

(112)   Doxxing as "social engineering" has been hugely successful to date, obtaining the firing, suspension or expulsion, cancellation of opportunities for participation or public speaking

at venues and events, and social ostracism of the victims, as well as making their lives a living hell as they are barraged with death and rape threats, and everyone around them receives frightening anonymous emails, phone calls and text messages.

(113)   Penn and numerous other universities have already fired and sanctioned members of their academic communities based solely on doxxing "evidence".

(114)   Plaintiff Fakhreddine and numerous members of PFJP have been doxxed as a result of their First Amendment-protected speech and have received death and rape threats.

(115)   There is truly nothing new under the sun: in the 1950's, a half century before social media, the tactics of McCarthyism included a forerunner of doxxing: people subpoenaed or mentioned by HUAC would be fired from their jobs, and also those whose names were bandied about in an influential private publication, *Counterattack*.

(116)   *Counterattack* magazine and the notorious "Red Channels" report it published were the 1950's predecessor of a doxxing website, listing the names of actors, directors, screenwriters and other workers in the entertainment industry with the intention, usually successful, of ending their careers.

(117)   In so doing, *Counterattack*, founded by former FBI agents, supported the work of HUAC.

(118)   That secretive, diseased relationship is recapitulated today by the mutual support between doxxing sites such as the anonymous Canary Mission and the Committee.

**PRELIMINARY AND PERMANENT INJUNCTION STANDARDS**

(119)   Penn's continuing cooperation with, and disclosure of private and confidential information about Plaintiffs to the Committee, threatens all Plaintiffs with the irreparable harm of a renewed and continued barrage of death and rape threats and hate speech, and also with exposure

of members of PFJP who have not previously been doxxed.

(120)   Student records cannot be disclosed without consent under the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g.

(121)   The Committee via the Information Letter is requesting the disclosure of student information by Penn deemed confidential under FERPA, such as student disciplinary records.

(122)   Student members of PFJP and other students similarly situated have neither been asked by Penn for their consent, nor do they consent to such disclosure to the Committee.

(123)   Disclosure of their records to the Committee will result in Plaintiffs, the individuals and faculty and student members alike, inevitable being falsely condemned and exposed on doxxing sites, with the concomitant barrage of death and rape threats and hate speech directed to them, their peers, relatives, deans, or professors.

(124)   In fact, disclosure of Plaintiffs' confidential information to the public by the Committee is itself a form of doxxing, which will result in public exposure in a false light, and bring a flood of unwelcome and threatening attention, with consequences for their safety, stability, mental health, academic freedom, and educational and career prospects.

(125)   Plaintiffs have a likelihood of success on the merits, based on the patent unconstitutionality of the IHRA standards, the overbreadth of the Information Letter, and their strong claims of First Amendment retaliation and viewpoint discrimination.

(126)   A balancing of the equities favors Plaintiffs, in that grant of a permanent injunction against the disclosure of documents works no harm on Penn, while the denial of the injunction will be devastating for Plaintiffs.

## FIRST CAUSE OF ACTION
### First Amendment

(127)   Paragraphs 1 through 126 are re-alleged.

(128)   Penn, by cooperating with the Committee's gross infringements of Plaintiffs' First Amendment rights, is aiding and abetting those violations.

(129)   The Committee is a government actor directly subject to the First Amendment.

(130)   Penn, by cooperating with the Committee, is merging with, in effect becoming the tool and instrumentality used by a government actor-- thereby becoming a government actor itself.

(131)   The Committee and Penn are engaging in and threatening two egregious violations of Plaintiffs' First Amendment rights, in that they are committing and threatening First Amendment retaliation and viewpoint discrimination.

(132)   In an act of retaliation for protected speech, the Committee and Penn are punishing, threatening, censoring, frightening and chilling Plaintiffs for their expression of protected, pro-Palestinian political and moral views.

(133)   In an act of viewpoint discrimination, the Committee and Penn are privileging, protecting and endorsing pro-Israeli speech in the Penn academic community over pro-Palestinian speech.

## SECOND CAUSE OF ACTION
### 14th AMENDMENT

(134)   Paragraphs 1 through 133 are re-alleged.

(135)   The 14th Amendment creates powerful rights of privacy for students and faculty Plaintiffs alike and for others similarly situated.

(136)   The Committee via the Information Letter is requesting the disclosure of both faculty and student information by Penn which is confidential under the 14th Amendment, such as

student disciplinary records and faculty personal communications and writings.

## THIRD CAUSE OF ACTION
### Pennsylvania Constitution – Privacy

(137)   Paragraphs 1 through 136 are re-alleged.

(138)   The Pennsylvania Constitution creates powerful rights of privacy for students and faculty Plaintiffs alike and for others similarly situated.

(139)   The Committee via the Information Letter is requesting the disclosure of both faculty and student information by Penn which is confidential under the Pennsylvania Constitution, such as student disciplinary records and faculty personal communications and writings.

## FOURTH CAUSE OF ACTION
### Breach of Contract

(140)   Paragraphs 1 through 139 are re-alleged.

(141)   Penn made specific promises and assertions to all Plaintiffs regarding diversity, freedom of speech, academic freedom, and good faith and fair dealing, in its contracts, student and faculty manuals,  on its web sites, and in pronouncements and assertions in writing by officers and others authorized to speak for Penn.

(142)   Plaintiffs relied on these promises, faculty by accepting employment at Penn, students by paying tuition to Penn.

(143)   By cooperating with and disclosing information about them to the Committee, Penn has refused and failed to carry out the duties it assumed towards Plaintiffs by these binding terms and conditions of its contracts, manuals and materials.

WHEREFORE, on all Causes of Action, Plaintiffs demand issuance of a preliminary an permanent injunction enjoining Penn from complying with the Information Letter, together with such other and further relief as may be just and proper.

Dated:        March 08, 2024

Respectfully Submitted,

Shahily Negron, Esq.
Attorney ID: 332842

The Law Firm of Shahily Negron, Esq.
d/b/a Negron Law

943 Washington Street
Reading, PA 19601

Phone: (646) 484-1491
Fax: (347) 814-1827
Email: shahily@lawnegron.com

Attorney for Plaintiffs