UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA
-------------------------------------------------------------x

HUDA FAKHREDDINE,
EVE TROUTT POWELL, and PENN
FACULTY FOR JUSTICE IN PALESTINE,                   CASE NO: 24-cv-01034-KNS

                              Plaintiffs,                   **AMENDED COMPLAINT**

        -against-

THE UNIVERSITY OF PENNSYLVANIA,

                              Defendants,

-------------------------------------------------------------x

        Plaintiffs Huda Fakhreddine, EveTroutt Powell, and Penn Faculty for Justice in Palestine,

plaintiffs, for their Amended Complaint against the defendant University of Pennsylvania

("Penn") allege as follows:


                              **PRELIMINARY STATEMENT**

1.  This nation is seeing the advent of a new form of McCarthyism, in which
    accusations of anti-Semitism are substituted for the insinuations of Communist
    leanings which were the tool of oppression in the 1950's.

2.  The House Committee on Education and the Workforce (the "House Committee")
    has eagerly assumed the role of the House Unamerican Activities Committee of
    old ("HUAC"). On December 5, 2023, the Presidents of the University of
    Pennsylvania, Harvard, and MIT were called before the House Committee and
    asked questions which were intentionally phrased to place them in a false light as
    to their actions to combat anti-Semitism. This bad faith questioning was so

effective that two of the three presidents have since been forced to resign, including Elizabeth Magill of Penn.

3.   The House Committee has eagerly joined billionaire donors, pro-Israel groups, other litigants, and segments of the media in accusing Penn of being a pervasively anti-Semitic environment (which it is not) — but to advance this narrative, every one of these participants in the hue-and-cry, including the House Committee, have asserted that anti-Zionism, and in fact virtually any criticism of the state of Israel, is anti-Semitism.

4.   Criticisms of the nation-state, Israel, including statements of anti-Zionism, are First Amendment-protected speech. The new McCarthyism has, since long before October 7, been highly successful at getting individuals fired from jobs, expelled or suspended from universities, denied tenure or advancement, demoted from prominent media roles, and dropped by entertainment agents, as well as successfully obtaining the rescission of offers of employment, and of invitations to participate in conferences and workshops, speaking engagements and numerous other opportunities. This new McCarthyism, which was growing slowly before the Hamas atrocities on October 7, 2023, but is surging up very rapidly now, has already been hugely successful at ending careers and blighting lives, just like its predecessor.

5.   Individual plaintiffs are tenured Penn professors who have been threatened, accused, and doxxed for the subject matter they teach, and their First Amendment protected criticism of Israel and their advocacy for Palestinians and the people of Gaza. Neither of them is an anti-Semite, but both have been falsely accused of

bias towards Jews.

6. Plaintiff Fakhreddine is an Arab American who additionally has been reviled for her national origin and ethnicity. Two members of the House Committee, relying uncritically and likely maliciously on false narratives, mentioned her by name on national television during the hearing,   falsely accusing her of antisemitism and demanding she be fired.

7. The House Committee sent a letter to Penn (the "Information Letter") demanding the production of many categories of information, including documents pertaining to criticism of Israel and pro-Palestinian speech by faculty and students,  private FERPA-protected student disciplinary files and documents pertaining to an annual scholarly event produced by plaintiff Fakhreddine focusing on Palestinian literature, the Palestine Writes Festival. Since this was not a subpoena but a letter requesting voluntary compliance, Penn would have been within its rights to protect its community by refusing compliance. Instead, Penn, its trustees off balance and frightened by the accusations of anti-Semitism, announced it would comply with the House Committee's letter, and, on information and belief, has begun producing documents.

8. Penn's voluntary compliance with the  Information Letter has already harmed Plaintiffs and will continue to do so, threatening the privacy, safety, academic freedom and careers of the individual Plaintiffs and of many other members of the Penn Faculty for Justice in Palestine.

**THE PARTIES**

9.  Plaintiff Huda Fakhreddine, a professor at Penn, is a leading scholar of Arabic literature, whose work focuses on modernist movements or trends in Arabic poetry and their relationship to the Arabic literary tradition.

10. Plaintiff Eve Troutt Powell is a professor of History and Africana Studies at Penn, and a former President of the Middle East Studies Association.

11. Plaintiff Penn Faculty for Justice in Palestine ("PFJP") is a collective of faculty, students, staff, researchers, and graduate employees at the University of Pennsylvania who support Palestinian human rights and liberation from Israeli occupation.

12. The University of Pennsylvania is a private university, also known as the Trustees of the University of Pennsylvania, which is organized under the laws of Pennsylvania and located in Philadelphia, Pennsylvania.

**JURISDICTION AND VENUE**

13.  This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

14. This Court has personal jurisdiction over Penn because it is based and operates in Philadelphia, Pennsylvania.

15. Venue in this District is proper under 28 U.S.C. § 1391 because it is the judicial district in which a substantial part of the events or omissions giving rise to plaintiffs' claims occurred and where Penn is located.

## FACTS WHICH ESTABLISH STANDING

16.  Plaintiff Huda Fahreddine has been personally threatened, her safety endangered, by the making of false accusations against her by the House Committee. By giving them more confidential documents about her, Penn is assisting the House Copmmittee in continuing to target, oppress and harm Dr. Fakhreddine.

17. At the December 5 hearing of the House Committee, Committee member Joe Wilson of South Carolina, delivering an exemplary and enthusiastic McCarthyesque performance, demanded that Defendant's then President, Elizabeth Magill inform him what percentage of Penn professors are conservatives, concluded that the answer was "zero", blasted diversity, equity and inclusion, finally naming plaintiff Fakhreddine, to whom he has never spoken, but only received false and hateful doxxing "information", and asking, "How are Jewish students in Fakhreddine's classes supposed to receive fair treatment when she endorses hatred?"

18. At the same hearing, Committee member Jim Banks of Indiana, in another exemplary McCarthyist performance, after asking Magill why she invited anti-Semites to the Palestinian Writes Festival, cast doubt on whether she had issued a condemnation of anti-Semitism, claiming he hadn't been able to find it, then demanded to know why Plaintiff Fakhreddine "still [has] a job at your university".

19. The Information Letter the House Committee then sent to the Defendant on January 24, 2024 , demanding the production of numerous documents made specific reference to Plaintiff Fakhreddine as follows: "Associate Professor of

Arabic Literature Huda Fakhreddine publicly celebrated the attack on the morning of October 7, tweeting in Arabic that 'while we were asleep, Palestine invented a new way of life.' At an October 16, 2023, anti Israel protest on Penn's campus, Fakhreddine said, 'Israel is the epitome of antisemitism … it desecrates the memory of the Holocaust victims. It humiliates every Jewish person.' Fakhreddine also applauded a speaker's statement that Jews should 'go back to Moscow, Brooklyn, Gstaad, or fucking Berlin where you came from.'"

20. All of these assertions were derived from doxing "information". Some are entirely false, others taken out of context, and none represent the results of a conversation with Fakhreddine by the House Committee or staff, or any kind of neutral, fair investigation. Instead, they are opportunistic, amoral attacks and libels intended simply for political gain.

21. In fact, this McCarthyite and shameful rhetoric of the House Committee and its members represents no valid legislative purpose.

22. No statement actually made by Plaintiff Fakhreddine was antisemitic; and all are First Amendment-protected.

23. The Information Letter also falsely refers to the Palestine Writes Literature Festival, co-organized by Dr. Fakhreddine, as "virulent[ly] antisemiti[c]" and falsely claims that "Multiple speakers engaged in antisemitic hate speech at the Penn-hosted and sponsored festival itself".

24. The Information Letter contains specific demands for categories of documents, to which those referencing Plaintiff Fakhreddine are responsive. For example, request #4 calls for "Documents sufficient to show the findings and results of any disciplinary processes, changes in academic status, or personnel actions by Penn

toward Penn students, faculty, staff, and other Penn affiliates related to conduct involving the targeting of Jews, Israelis, Israel, Zionists, or Zionism since January 1, 2021".

25. Request #6 states: "All documents and communications relating to or reflecting sources of funding for Penn Students Against the Occupation, the Palestine Writes Festival, and the Freedom School for Palestine, including but not limited to university, departmental, faculty, and student organization funds, as well as foreign donations".  Requests #12 and 16 also call for information about Palestine Writes.

26. Request #7 calls for: "Documents sufficient to show findings and results of any disciplinary processes, changes in academic status, or personnel actions by Penn toward Penn students, faculty, staff, student organizations, and other Penn affiliates as a result of:  a. allegations of hate crimes, discrimination, bias, or harassment on the basis of religion, ethnicity, national origin, sex, sexual orientation, gender identity, and disability at Penn since January 1, 2021;  b. Reports of denial or disruption of access to safe and uninterrupted learning environments at Penn since January 1, 2021".

27. Request #16 states:  "All documents and communications, including, but not limited to, those involving the Office of the President, Office of the Provost (including University Life), Division for Public Safety (including Penn Police Department), Penn Human Resources, and/or any other entities responsible for investigating and determining consequences for misconduct and violations of university standards, referring and relating to:....(c) Posts by Penn students, faculty, staff, and other Penn affiliates on Sidechat and other social media platforms targeting Jews, Israelis, Israel,

Zionists, or Zionism;   (d)Anti-Israel protests at Penn, and any disruptions to education and student life related to them, since October 7, 2023, including but not limited to the October 16, 2023, protest, Palestine Freedom School, and December 3, 2023, protest".

28. Request #17 demands: "All documents and communications including, but not limited to, those involving the Office of the President, Office of the Provost (including University Life and its Office of Diversity, Equity, Inclusion, & Belonging), and/or any academic departments, programs, and centers, referring or relating to any efforts by Penn students, faculty, and staff to engage in the BDS movement against Israel since January 1, 2021, and communications by Penn administrators relating to such efforts".

29. Many other requests are for documents which might mention Plaintiff Fakhreddine, for example, Request #1 for "All reports of antisemitic acts or incidents" made to the President or General Counsel's office; and # 9, " All documents and communications since January 1, 2021, referring and relating to antisemitism involving the Office of the President and Office of the Provost".

30. Defendant by now on information and belief has produced documents about Fakhreddine to the House Committee.

31. On February 27, 2024, the *Daily Pennsylvanian* reported that Defendant had begun sending documents to the House Committee. "[T]he University spokesperson told the DP that the process of transferring documents would last multiple weeks....A House education committee spokesperson confirmed to the DP that the committee has received documents and is currently reviewing them." Ethan Crawford, "Penn begins submitting documents to House education

committee for antisemitism investigation", *The Daily Pennsylvanian*
https://www.thedp.com/article/2024/02/penn-congress-house-education-
workforce-investigation-submit-documents

32. The transfer of documents about her to the House Committee harms and threatens
Plaintiff Fakhreddine.

33. The House Committee, as was evidenced by the statement made by
Congressperson Banks at the December hearing, is attempting to pressure and
bully Defendant to terminate Plaintiff Fakhreddine.

34. A dishonorable, McCarthyite tactic used by the House Committee is "jawboning",
beating up targets such as Penn,  via accusations such as those made by
Congresspeople Banks and Wilson that Penn  is failing to terminate, censor,
sanction and chill purported "antisemites", who are in reality critics of Israel.

35. The House Committee uses any information in its possession, from whatever
source, to accomplish its goals, including the doxing "information" already
shamefully used by Congresspeople Banks and Wilson to slander Dr.
Fakhreddine.

36. The House Committee has no legal obligation, nor has it made any promise, to
keep any information received from Penn or any other source confidential, but
remains free to distribute it to the press and to members, include it in releases,
reports and letters, or post it on the Internet-- all of which it has already done.

37. The publication by the House Committee of any documents received by Penn
about Plaintiff Fakhreddine will encourage anonymous Internet trolls to send her
death threats and hate speech to her university and private emails and to her

university and private phones, all of which she has been receiving in substantial amounts since  the Congresspeople mentioned her in December.

38. In its June 24, 2024 memorandum dismissing the original Complaint, this Court said: "Plaintiffs do not allege whether documents Penn plans to produce would include their personal contact information such as home addresses."

39. This  is beside the point.

40. On the one hand, Penn certainly possesses documents whuch contain Dr. Fakhreddine's address and phone number; she is, after all, Penn's employee.

41. The extreme vagueness of the Information Letter, and the secrecy surrounding Penn's response, makes it impossible for Plaintiffs to know, at this stage of the case, and prior to discovery, what Penn has produced.

42. For example, Request #1 calls for "All reports of antisemitic acts or incidents *and related documents and communications* since January 1, 2021" (Emphasis added). How are Plaintiffs to know that their employee files containing residence and contact information were not consideered by Penn to be "related"? Certaainly emails to and from individual Plaintiffs or FSJP members and Penn administration, to or from their university or personal email addresses, or containing phrases like "please call me at....", or containing an address in the .sig line would be produced, if responsive to communicatons about purported antisemitism.

43. Penn should not have been permitted to benefit from its very intentional and studied vagueness about its compliance.

44. Request #4 states: "Documents sufficient to show the findings and results of any disciplinary processes, *changes in academic status, or personnel actions* by Penn toward Penn students, faculty, staff, and other Penn affiliates related to conduct

involving the targeting of Jews, Israelis, Israel, Zionists, or Zionism since January 1, 2021" (emphasis added). Certainly doccuments reflecting "changes in academic status" or "personnel actions", which might for example be in the form of emails or letters via US mail, would contain contact information. (See also the similar #7.)

45. Documents responsive to Request #6 would also be likely to contain emails, postal addresses and phone numbers: "All documents and communications relating to or reflecting sources of funding for Penn Students Against the Occupation, the Palestine Writes Festival, and the Freedom School for Palestine, including but not limited to university, departmental, faculty, and student organization funds, as well as foreign donations".

46.  Request #9 is an extremely broad catch-all, which would contain any letters written by Plaintiffs to Penn administration on letterhead, or emails with "From:" information or .sig lines. (See also #11).

47. Request 16(c)  calls for "All documents and communications....referring and relating to: ….(c) Posts by Penn students, faculty, staff, and other Penn affiliates on Sidechat and other social media platforms targeting Jews, Israelis, Israel, Zionists, or Zionism". These posts on social media would also contain or link to social media account information allowing trolls to contact Plaintiffs.

48. On the other hand, even if Penn's disclosures contained no personal contact information for Plaintiffs, which is improbable, that would not affect or undermine Plaintiff;'s claims in any way.

49. To bring death threats and hate speech to an individual, a statement or document prepared by the House Committee need not contain any contact information at all.

50. For example, Congressman Wilson's false statement on national television that

"Fakhreddine.... endorses hatred" against Jews contained no other information about her except her affiliation with Penn-- but that was sufficient for Internet trolls to use the Internet to discover contact information for Plaintiff Fakhreddine.

51. A search on anyone's name on the Internet tends to turn up information from third party data brokers, who without the individual's knowledge and consent, offer for a fee personal addresses, phone numbers and emails.

52. There are many other ways that an individual's contact information can wind up on the Internet without their knowledge or intent, and most of us are insufficiently expert in online communications to be able to prevent this.

53. Sociopathic Internet trolls are adept at using the Internet to discover nort only contact information for their targets, but that of theuir relatives, feriendsa, co-workers and employers, all of whom they also barrage with email.

54. The harm is thererfore accomplished when the House Committee or a member says a Plaintiff's name, regardless of whether any contact information is associated.

55. In his essay, "On a Supposed Right to Lie Because of Phialnthropic Concerns", Immanel Kant posited that we must "honestly answer[] Yes to the murderer's question as to whether the intended victim is in the house". Despite Kant's reasoning, most of us would instinctively withhold the information from the killer.

56. Penn is doing the opposite. Asked by the House Committee for information that it can distort, twist and misrepresent in an attempt to invoke death threats and hate speech directed at Dr. Fakhreddine, and also to end her career, Penn is voluntarily complying.

57. In their letter to Penn counsel on January 30, 2024, the undersigned specifically warned Penn that its compliance with the Information letter woulkd inevitably lead "to increased harassment, hate, and threats,causing Dr. Fakhreddine and her family to fear for the safety".

58. Penn complied anyway.

59. Defendant is remarkably in derogation of academic freedom and its contractual duties to Plaintiff, and her Constitutional rights, wilfully endangering Plaintiff Fakhreddine by cooperating with, and providing information about her to,  the House Committee.

60. Plaintiff Eve Troutt Powell similarly has standing becauase she is a faculty member who has taught Middle Eastern history, uttered speech and participated in symbolic speech  criticizing Israel and supporting the people of Palestine, and files and documents referencing her are responsive to the Information Letter.

61. Organizational Plaintiff Faculty for Justice in Palestine has standing because Plaintiffs Fakhreddine and Powell are members, as are many other faculty and students who are also vulnerable to McCarthyite tactics, bullying, doxing, threats and outside pressure because documents referencing them are responsive to the Information Letter and have already been produced.

62. In addition, some members of FJP are graduate students, whose FERPA rights are being violated by disclosure of their files to the House Committee.

63. Some students who are FJP members have been charged with University student code violations in connection with their pro-Palestinian and have undergone disciplinary proceedings. Student disciplinary files are covered under FERPA and

cannot be voluntarily produced without the student's consent.

64. Information Letter Requests #'s 4, 5 and 7 call for confidential student disciplinary files.

65. Students in disciplinary proceedings have been informed by University staff that their files are being sent to Defendant's counsel for production in response to the Information Letter.

66. On January 30, 2024, undersigned counsel wrote to Defendant on behalf of Plaintiff Fakhreddine and others requesting that the "University desist from any disclosures to Congress which contain faculty, student, and staff names or identifying information...We are available, and in fact eager, to meet with your administration to discuss steps for collaboration that ensure the safety of student and faculty speech and expression." No such meeting took place.

67. On June 30, 2024, undersigned counsel emailed counsel for Defendant proposing "a meeting at which your firm, and my co-counsel and I, without clients present, review and discuss all documents the University has already produced which reference Fakhreddine". Defendant's counsel immediately responded declining cooperation.

68. The documents regarding Plaintiffs already disclosed by Defendant to the House Committee have inflicted cognizable harm in Plaintiffs compensable by damages.

69. Plaintiffs maintain their request for a permanent injunction as to responsive documents relating to Plaintiffs which have not already been produced.

## COGNIZABLE HARM

70.  Penn has never denied that it has produced documents to the House Committee, nor that those included documents referencing or relating to Plaintiffs Fakhreddine and Powell and the individual student and professor members of PFJP.

71. On information and belief, Penn and its counsel know perfectly well they have produced documents on these Plaintiffs, yet claim that the Complaint should be dismissed because Plaintiffs do not yet know exactly what has been produced-- so that harm is "speculative".

72. Plaintiffs have twice demanded to know what has been produced regarding their clients, the first time before instituting this action., and Penn has declined to comply.

73. Plaintiffs respectfully request that when Penn makes its motion to dismiss this Amended Complaint, this Court decline to do so, at least without ordering limited discovery on the issue of standing, as it has authority to do under FRCP 12(b)(1).

74. As previously mentioned,. Congressperson Joe Wilson stated at the December 5 hearing of the House Committee: "How are Jewish students in Fakhreddine's classes supposed to receive fair treatment when she endorses hatred?"

75. Congressperson Banks demanded at the same hearing why Dr. Fakhreddine "still [has] a job at your university".

76. Both did so not as part of any proper legislative project or mission, but solely, dishonestly, dishonorably and viciously for perceived personal political gain and advantage.

77. Both inflicted great harm on Dr. Fakhreddine by, in mentioning her name on national television, knowingly causing anonymous Internet trolls to research her, learn her public and private phone numbers and email accounts, as well as those of her peers and co-workers, and to send death threats, hate speech and defamatory emails to her and to them.

78. Penn by disclosing documents to the House Committee is cooperating with, consenting to and co-conspiring with regard to these vicious and dangerous attacks on Plaintiff Fakhreddine.

79. Although Plaintiff Fakhreddine has already been "doxxed" by the House Committee once, this does not avoid future harm or deprive her of standing, as the disclosure of documents about her will enable the Committee to doxx her again, summoning more death threats and hate speech.

80. Plaintiff Fakhreddine has in fact received numerous such violent, hateful, threatening and dangerous communications since, and as a result of, being doxxed by the House Committee.

81. Other Plaintiffs who have never been doxxed by the House Committee naturally wish to avoid the experience.

82. Penn has been informed and is perfectly aware that its disclosure of documents about Plaintiffs is harmful and dangerous to them, but has chosen to comply voluntarily with the House Committee, cooperating, enabling and co-conspiring in harming them.

## A COMMENT ON ANTI-SEMITISM

83. Plaintiffs and their counsel know there is real anti-Semitism in the world.

84. This controversy and action is not about *real* anti-Semitism (despite the fact that many hateful statements against all races, ethnicities, nationalities and religion are in fact also First Amendment protected per our Supreme Court).

85. This action instead concerns the McCarthyesque use of a vague, overbroad, patently unconstitutional definition, which is termed "anti-Semitism" in egregious ontological error, to chill, punish and end virtually all moral, political, legal, and other criticism of the nation-state Israel.

## THE HOUSE OF REPRESENTATIVES

86. Congress is a state actor directly governed and limited by the First Amendment.

87. While Congress is permitted under certain circumstances to exempt itself from the application of certain laws it enacts, or to waive their applicability under specific circumstances, Congress may not, ever, avoid the strictures imposed on it by the First Amendment.

88. When it comes to allegations of anti-Semitism, however, the would-be McCarthyesque House of Representatives is behaving as if it never heard of the First Amendment.

89. On December 5, 2023, the House passed Resolution 894 on anti-Semitism, which contains two statements which express a patent intention to violate the First Amendment rights of Americans:

90. The first is a "Whereas" clause, "Whereas the International Holocaust

Remembrance Alliance's working definition of antisemitism is widely accepted".

91. The International Holocaust Remembrance Alliance ("IHRA"), discussed in more detail below, is an NGO which proposed its own private speech code, never intended to be enacted into law.

92. The IHRA standards if legislated would patently violate the First Amendment; for example, they define as anti-Semitism the comparison of Israelis with Nazis, or the questioning of the right to a Jewish homeland, and even holding Israel to higher moral standards than other nations-- all of which, even if phrased in an upsetting, unpleasant way, are clearly political expression protected by the First Amendment.

93. Another statement in the resolution which is even more starkly violative of the First Amendment occurs near the end: "resolved, that the House of Representatives....clearly and firmly states that anti-Zionism is antisemitism".

94. This grammatical English sentence is actually as ontologically, and even epistemologically absurd, as if the House resolved that Pi is 7.87 instead of 3.14, or that bananas are vegetables.

95. Zionism is a political ideology held by some Jewish people which includes both pragmatic, political and some asserted faith-based elements.

96. Many of the founders of Zionism and, later, of the Israeli state, were secular individuals, such as Theodor Herzl, for whom the Old Testament and religious justifications had nothing to do with their desire to establish a Jewish state.

97. Today, there are numerous Jewish people in America, and through-out the world, who are not Zionists, and some of whom actively and publicly criticize Zionism.

98. For example, there are groups of Hasidic Jews who consider themselves anti-Zionist and who even participate in pro-Palestinian demonstrations.

99. Also, many members of Reform Judaism are not Zionists, and criticize the actions of the Israeli state towards Palestinians.

100. Many other Jewish intellectuals, writers and critics have rejected an "Israel right or wrong" attitude and have publicly criticized Israel's treatment of Palestinians.

101. The militant minority which believes that Israel can do no wrong, even when it drops 2,000-pound bombs on civilian areas, destroying 80% of housing, hospitals, schools and universities, and kills thousands of children, has no trouble categorizing Jews criticizing Israel as anti-Semitic themselves, self-hating, disturbed, marginal, and not really Jews.

102. The House is in fact privileging a minority of the American Jewish population, not only over Arab Americans and all others criticizing Israel or supporting Palestinians-- the House is in fact privileging this militant minority over all Jewish Americans who do not share their views.

103. In its actions, the House is committing two textbook violations of the First Amendment, retaliation, and viewpoint discrimination.

104. The House is, exactly as HUAC did in the 1950's, reaching out to chill, threaten and punish Americans whose views it disapproves.

105. It is also taking sides by promoting pro-Israeli political speech over pro-Palestinian political speech, though both are First Amendment-protected.

106. It is hornbook law that even a Congressional subpoena, which the

Case 2:24-cv-01034-MSG   Document 35   Filed 07/08/24   Page 20 of 37

Information Letter is not, must serve a legitimate legislative purpose.

107.     Since the House cannot pass legislation stating that anti-Zionism is anti-Semitism or excluding criticism of Israel from the coverage of the First Amendment, the Information Letter serves no legitimate congressional purpose.

108.     The House Committee is eagerly assuming the McCarthyesque role played by HUAC in the 1950's.

109.     The House Committee's adoption of the unconstitutional IHRA standards and of the improper and untenable proposition that anti-Zionism equals anti-Semitism, its eager use of the Information Letter to seek confidential information on students in violation of the FERPA laws, its unsavory interaction with doxxing sites, its apparent interest in exposure of its targets to harm and censure (making the House Committee a doxxing site itself) and its lack of any authorization from the House to issue the Information Letter on this topic, all characterize it as  a "rogue committee", off on an illegitimate and malicious mission of its own.

110.     The House Committee summoned President Elizabeth Magill of Penn to appear before it "voluntarily" on December 5, 2023, along with the Presidents of Harvard and MIT. Magill duly appeared as requested, answering the House Committee members' malicious, insinuating, trick questions, many of which were based on the assumption that any political criticism of Israel is anti-Semitic.

111.     Magill, asked whether such speech violated Penn's student code of conduct, answered that such a determination would be "context dependent".

112.     This was in fact a good faith and honorable answer pursuant to the First Amendment and Penn's commitments regarding academic freedom.

113.     However, the House Committee in effect doxxed Magill, accusing her falsely of anti-Semitism, and bringing about a barrage of other voices demanding her resignation, including powerful billionaire donors holding right wing and pro-Israel views.

114.     Just four days later,  Magill, unable to withstand this doxxing and relentless, hateful pressure, and unprotected by Penn's trustees, resigned as President of Penn.

115.     Also at the December 5  hearing, House Committee members Wilson  and Banks both mentioned Plaintiff Fakhreddine, accusing her of antisemitism and demanding her termination.

116.     By the way, Wilson's use of the anti-Semitism trope to attack diversity, equity and inclusion on campus is very common on the far right today, and evocative of how the weaponized concept has little or nothing to do with the protection of Jewish Americans.

117.     On January 24, 2024, the House Committee sent the Information Letter to Penn   demanding that it produce by February 7, sixteen categories of documents, including certain requests with  ten or eleven subcategories.

118.     The Information Letter also mentions Plaintiff Fakhreddine by name, again accusing her of anti-Semitism.

119.     Although the Information Letter is not a subpoena and has no legal compulsory effect, so that Penn would have been within its rights to protect the academic freedom and privacy of its community by refusing compliance, Penn has already  produced documents in response.

120.     Famous words uttered about HUAC are of equal import today as applied to the House Committee. Justice Hugo Black, dissenting in *Braden v. United States,* 365 U.S. 431, 444 (1961), wrote of  the conviction of a civil rights activist for refusing to answer questions when subpoenaed before HUAC: "The very foundation of a true democracy and the foundation upon which this Nation was built is the fact that government is responsive to the views of its citizens, and no nation can continue to exist on such a foundation unless its citizens are wholly free to speak out fearlessly for or against their officials and their laws. When it begins to send its dissenters....to jail, the liberties indispensable to its existence must be fast disappearing".

121.     Martin Luther King then commented on *Braden*, endorsing Justice Black's dissent*:* "[I]f the Committee [HUAC] has unlimited powers it will misuse them. Braden was called before the Committee simply for his integration activities. We think that if the Un-American Activities Committee is to have the power to subpoena everyone, they will misuse the power to stand in the way of integration."

122.     What today's House Committee is doing is identical: it is rooting out, penalizing and will soon criminalize certain First Amendment-protected speech its members detest.


### A THOUGHT ABOUT THE ESTABLISHMENT CLAUSE

123.     Three religions, Judaism, Islam and Christianity, have each formulated a faith-based claim to the Holy Land.

124.     The Court, if it were to decide that anti-Zionism is anti-Semitism, would

not only be infringing the speech and association clauses of the First Amendment,

but also the establishment clause, by privileging one faith-based claim to the Holy

Land over the others.


**THE IHRA STANDARDS**

125.     IHRA, a NGO founded in 1998, describes itself as deploying a "network

of trusted experts [who] share their knowledge on early warning signs of present-

day genocide and education on the Holocaust. This knowledge supports

policymakers and educational multipliers in their efforts to develop effective

curricula, and it informs government officials and NGOs active in global

initiatives for genocide prevention".

https://www.holocaustremembrance.com/about-us

126.     The IHRA on its web site defines its standards as a "non-legally binding

working definition". It also specifies that "criticism of Israel similar to that

leveled against any other country cannot be regarded as antisemitic".

https://www.holocaustremembrance.com/resources/working-definitions-charters/working-
definition-antisemitism

127.     Kenneth Stern, one of the drafters of the IHRA Standards, has since said:

"It's not the definition that's the problem. It's the abuse of it....There was never

any idea that this would be used as a de facto hate speech code on campus....[I]t

sets up a system in which administrators have a reason to either condemn or try to

suppress pro-Palestinian speech because their job is to keep the university from

being sued under Title VI....A lot of this comes to whether anti-Zionism is anti-

Semitism or not.... I don't like government putting its thumb on the scales inside of a debate inside the Jewish community....Do I think it's going to chill speech? Yeah, and I think that's the purpose. " Eric Cortelessa, "The scholar who wrote the definition of anti-Semitism says it's been subverted", January 9, 2020 https://www.timesofisrael.com/the-scholar-who-wrote-the-definition-of-anti-semitism-says-its-been-subverted/

### THE IMPACT ON PLAINTIFFS

128.     The relentless characterization of the individual Plaintiffs and members of the PFJP as anti-Semitic (which they are not) has already, in addition to the hatred expressed against them, also created an environment of profound danger, fear and distrust, in which it is impossible to enjoy any semblance of academic freedom.

129.     Plaintiffs have been doxxed on sites like the anonymous and hateful Canary Mission, and have received death threats, threats of violence, and hate speech directed at their nationality, ethnicity, gender, religion, and beliefs.

130.     Plaintiff Fakhreddine has been excluded from faculty meetings, her emails to the members of her department censored, and co-sponsorship of events canceled.

131.     Plaintiff Powell has been doxxed, placed on the Canary Mission website because of her involvement in pro-Palestinian protests, and has received hundreds of threatening and hateful emails.

132.     Professors, at Penn and nationwide, are left wondering whether it is any longer safe to teach courses about the history of colonialism, or to present a

nuanced view in a classroom of the history of the Middle East.

133.    There has not been such a grotesque limitation on academic freedom since the McCarthy era.

134.    The House Committee's relentless attack on academic freedom at Penn is in fact consistent with other declared goals of the Congresspeople involved and their party, to eliminate diversity, equity, and inclusion and all "woke" ideas in higher education.

135.    As an idea of "Communism" was in the McCarthy era, so is "anti-Semitism" being used today, as a crowbar to break through many doors.

## DOXXING AND THE NEW MCCARTHYISM

136.    There is a direct, diseased relationship between the House Committee's operations and the Internet practice of "doxxing", in that the House Committee has already utilized false information from doxxing sites in its work (for example, the allegations made against plaintiff Fakhreddine by two congressfolk)-- and the likelihood that the confidential information about members of the academic community disclosed pursuant to the Information Letter by Penn will lead to the immediate doxxing by Canary Mission and other hateful sites of the students and faculty named.

137.    In the history of technology, there have been numerous instances of new, important means of expressions and communication which legislatures and courts took decades to understand.

138.    For example, copyright laws were originally held inapplicable to movies

and music performed on player pianos; the First Amendment likewise was held inapplicable to film; case-law early in the history of the Internet struggled with questions such as whether emails were writings, or whether the First Amendment applied to content posted on web sites.

139.    Doxxing via social media is another technology development to which the laws and courts have not yet caught up.

140.    Doxxing is a "social engineering" tactic in which a targeted individual is exposed to unwelcome mass attention, with the aim of getting them fired from a job, expelled from a university, denied opportunities to speak or write, and ostracized socially.

141.    The allegations made against them are often entirely false, such as the accusations of anti -Semitism made against Plaintiffs herein.

142.    Doxxing sites usually also offer the public the target's name, address, and other affiliations such as employer or university-- and specifically call upon users to contact them.

143.    The intent of the doxxers is to encourage anonymous followers of the sites, many of them apparently sociopathic, to barrage the targeted individual with death and rape threats and hate speech, and also to contact their bosses, co-workers, and families.

144.    Doxxing sites often include highly edited videos or screenshots taken completely out of context, to create false versions of the target's opinions or relationship to events, as well as subtitles making sweeping, false assertions, such as a claim the individual supports murder, rape and terrorism.

145.     Doxxing as social engineering is not even limited to activist targets; individuals with no involvement in advocacy or protest have been fired from their jobs after a single social media post criticizing Israel or expressing compassion for the people of Gaza.

146.     Courts in their bewilderment about doxxing have sometimes reached the conclusion that calling someone an anti-Semite online is a mere nondefamatory expression of opinion protected by the First Amendment, missing the huge element of intentional tortious harm inflicted on the victim.

147.     Doxxers, to the contrary, are using the new technologies of social media to do indirectly what they could not do directly: they cannot legally issue true threats against their targets, but by doxxing them they knowingly and solicit anonymous followers to do so.

148.     When the courts catch up to the realities of doxxing, they should hold it to be tortious, the intentional infliction of serious harm on the targeted person.

149.     Doxxing as "social engineering" has been hugely successful to date, obtaining the firing, suspension or expulsion, cancellation of opportunities for participation or public speaking at venues and events, and social ostracism of the victims, as well as making their lives a living hell as they are barraged with death and rape threats, and everyone around them receives frightening anonymous emails, phone calls and text messages.

150.     Penn and numerous other universities have already fired and sanctioned members of their academic communities based solely on doxxing "evidence".

151.     Plaintiff Fakhreddine and numerous members of PFJP have been doxxed

as a result of their First Amendment-protected speech and have received death and rape threats.

152.     There is truly nothing new under the sun: in the 1950's, a half century before social media, the tactics of McCarthyism included a forerunner of doxxing: people subpoenaed or mentioned by HUAC would be fired from their jobs, and also those whose names were bandied about in an influential private publication, *Counterattack*.

153.     *Counterattack* magazine and the notorious "Red Channels" report it published were the 1950's predecessor of a doxxing website, listing the names of actors, directors, screenwriters and other workers in the entertainment industry with the intention, usually successful, of ending their careers.

154.     In so doing, *Counterattack*, founded by former FBI agents, supported the work of HUAC.

155.     That secretive, diseased relationship is recapitulated today by the mutual support between doxxing sites such as the anonymous Canary Mission and the House Committee.

## PERMANENT INJUNCTION STANDARDS

156.     Penn's continuing cooperation with, and disclosure of private and confidential information about Plaintiffs to the House Committee, threatens all Plaintiffs with the irreparable harm of a renewed and continued barrage of death threats and hate speech, and also with exposure of members of PFJP who have not previously been doxxed.

157.    Student records cannot be disclosed without consent under the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g.

158.    The House Committee via the Information Letter is requesting the disclosure of student information by Penn deemed confidential under FERPA, such as student disciplinary records.

159.    Student members of PFJP and other students similarly situated have neither been asked by Penn for their consent, nor do they consent to such disclosure to the House Committee.

160.    Student disciplinary records are confidential under Penn's rules as well as FERPA, and Penn assures students they can nerver be disclosed rto their parties' without the student's consent, even as it now is releasing such records voluntarily to the House Committee.

161.    Student disciplinary records contain information about the student which is hurtful, embarassing, would subject them to public censure, and interfere with their ability to obtain or keep gainful employment.

162.    Penn's voluntary production of student disciplinary files to the House Committee shocks the conscience.

163.    Although Penn claims that student files have been "redacted", the extent to which this has actually been done is a fact issue awaiting discoviery.

164.    Redacting a student disciplinary record merely by blacking out the name would be inadequate, as the file also contains where/ what/ when information that, by associating rthe student with a time, place and incident, would easily permit their identification by the House Committee or Internet trolls-- a task in wjhich

they delight and excel.

165.     Also, Congressperson Fox, Chair of the House Committee, has previously stated that the redacting of files is not considered compliance with the House Committee. In a March 6, 2024 press release, she stated: "I don't know if its arrogance, ineptness, or indifference that's guiding Harvard. Regardless, its actions to date are shameful...Harvard has absolutely failed to comply in good faith with the Committee's subpoena for information about antisemitism on its campus... Heavy redactions throughout the production made several documents useless. The Committee is weighing an appropriate response to Harvard's malfeasance."

https://edworkforce.house.gov/news/documentsingle.aspx?DocumentID=410218

166.     Disclosure of their records to the Committee will result in Plaintiffs, the individuals and faculty and student members alike, inevitable being falsely condemned and exposed on doxxing sites, with the concomitant barrage of death threats and hate speech directed to them, their peers, relatives, deans, or professors.

167.     In fact, disclosure of Plaintiffs' confidential information to the public by the Committee is itself a form of doxxing, which will result in public exposure in a false light, and bring a flood of unwelcome and threatening attention, with consequences for their safety, stability, mental health, academic freedom, and educational and career prospects.

168.     Plaintiffs have a likelihood of success on the merits, based on the patent unconstitutionality of the IHRA standards, the overbreadth of the Information

Letter, and their strong claims that the Information Letter has no valid legislative purpose, and is a weapon of First Amendment retaliation and viewpoint discrimination.

169.      Penn had no legal duty to comply with the Information letter, which is not a subpoena, and its voluntary production of confidential documents referencing Plaintiffs is wroingful and violative of Plaintiff's Constitutional, federal statutory and Pennsylvania rights.

170.      A balancing of the equities favors Plaintiffs, in that grant of a permanent injunction against the disclosure of documents works no harm whatever on Penn, while the denial of the injunction will be devastating for Plaintiffs.

## FIRST CAUSE OF ACTION

### First Amendment

171.       Paragraphs 1 through 170 are re-alleged.

172.      Penn, by cooperating with the Committee's gross infringements of Plaintiffs' First Amendment rights, is aiding and abetting those violations.

173.      The Committee is a government actor directly subject to the First Amendment.

174.      Penn, by cooperating with the Committee, is merging with, in effect becoming the tool and instrumentality used by a government actor-- thereby becoming a government actor itself.

175.      The Committee and Penn are engaging in and threatening two egregious violations of Plaintiffs' First Amendment rights, in that they are committing and

threatening First Amendment retaliation and viewpoint discrimination.

176.     In an act of retaliation for protected speech, the Committee and Penn are punishing, threatening, censoring, frightening and chilling Plaintiffs for their expression of protected, pro-Palestinian political and moral views.

177.     In an act of viewpoint discrimination, the Committee and Penn are privileging, protecting and endorsing pro-Israeli speech in the Penn academic community over pro-Palestinian speech.

## SECOND CAUSE OF ACTION

### 14th AMENDMENT

178.     Paragraphs 1 through 177 are re-alleged.

179.     The 14th Amendment creates powerful rights of privacy for students and faculty Plaintiffs alike and for others similarly situated.

180.     The Committee via the Information Letter is requesting the disclosure of both faculty and student information by Penn which is confidential under the 14th Amendment, such as student disciplinary records and faculty personal communications and writings.

## THIRD CAUSE OF ACTION

### Pennsylvania Constitution – Privacy

181.     Paragraphs 1 through 180 are re-alleged.

182.     The Pennsylvania Constitution creates powerful rights of privacy for students and faculty Plaintiffs alike and for others similarly situated.

183.     The Committee via the Information Letter is requesting the disclosure of both faculty and student information by Penn which is confidential under the Pennsylvania Constitution, such as student disciplinary records and faculty personal communications and writings.

## FOURTH CAUSE OF ACTION

### Breach of Contract

184.     Paragraphs 1 through 183 are re-alleged.

185.     Penn made specific promises and assertions to all Plaintiffs regarding diversity, freedom of speech, academic freedom, and good faith and fair dealing, in its contracts, student and faculty manuals,  on its web sites, and in pronouncements and assertions in writing by officers and others authorized to speak for Penn.

186.     Penn's Faculty Handbook contans Section IIA, Academic Freedom and Responsibility, which states: "It is the policy of the University of Pennsylvania to maintain and encourage freedom of inquiry, discourse, teaching, research, and publication and to protect any member of the academic staff against influences, from within or without the University, which would restrict a member of the academic staff in the exercise of these freedoms in their area of scholarly interest.....The teacher is entitled to freedom in the classroom in discussing their subject". https://catalog.upenn.edu/faculty-handbook/ii/ii-a/

187.     Penn also has implemented "Guidelines on Open Expression" for its students, which states: "The University of Pennsylvania, as a community of

scholars, affirms, supports and cherishes the concepts of freedom of thought, inquiry, speech, and lawful assembly. The freedom to experiment, to present and examine alternative data and theories; the freedom to hear, express, and debate various views; and the freedom to voice criticism of existing practices and values are fundamental rights that must be upheld and practiced by the University in a free society". https://catalog.upenn.edu/pennbook/open-expression/

188.     These statements constitute serious, material, specific commitments made by Penn to its faculty members and students enforceable by law.

189.     Plaintiffs Fakhreddine, Powell and the members of PFJP relied on these promises, faculty by accepting employment at Penn, students by paying tuition to Penn.

190.     By cooperating with and disclosing information about them to the Committee, Penn is intentionally exposing Plaintiffs to public threats, hate speech and physical danger, all as an act of retaliation and of viewpoint discrimination against them for their First Amendment-protected crirism of Israel and pro-Palestinian expression.

191.     Penn has refused and failed to carry out the duties it assumed towards Plaintiffs by these binding terms and conditions of its contracts, manuals and materials, and under its obligation of good faith and fair dealing towards them.


**FIFTH CAUSE OF ACTION**

**42 USC 1985- Conspiracy**

192.     Paragraphs 1 through 191 are realleged.

193.    Defendant conspired together with the House Committee  to deprive Plaintiffs of their civil rights in violation of 42 U.S.C. § 1985(3).

194.    The House Committee intentionally and illegitimately targeted the Plaintiffs for their criticism of Israel and for personal political advantage of the members, for their First Amendment-protected criticism of Israel and support of the Palestinian people.

195.    The House Committee engaged in willful acts of defamation against Plaintiff Fakhreddine, accusing her falsely of antisemitism and demanding she be fired from the University.

196.    The House Committee members in invoking Plaintiff Fakhreddine's name on national television, knew, expected and were satisfied that Plaintiff Fakhreddine would receive death threats and hate speech to her opublic and private email and telephones as a result.

197.    Defendant by voluntarily providing documents and information about Plaintiff Fakhreddine to the House Committee is knowingly supporting this tortious, unconstitutional and illegal attack on her and is therefore a co-conspirator.

198.    Similarly, by voluntarily providing names, documents and files on other Plaintiffs and the organizational Plaintiff itself and its members, Defendant is knowingly supporting and conspiring in the House Committee's malicious invocation of death threats and hate speech against these Plaintiffs.

199.    The conspirators intended their actions to have adverse effects upon an identifiable group—namely, pro-Palestinian activists and critics of Israel.

200.     The conspiracy targeted protected rights of Plaintiffs, who are   pro-Palestinian activists and critics of Israel.

201.     The conspiracy targeted Plaintiffs' protected First Amendment activities. Because Defendants held animus towards Plaintiffs' viewpoints. The actions of the conspirators directly and unlawfully interfered with these activities.

202.     The conspiracy violently interfered with Plaintiffs' right to use public accommodations, as the receipt of death threats and hate speech make Plaintiffs feel unsafe in public places.


WHEREFORE, on all Causes of Action, Plaintiffs demand damages in an amount to be determined by this Court, as to documents referencing them already produced to the House Committee; the issuance of a  permanent injunction enjoining Penn from complying with the Information Letter, as to such documents not already produced; a declaratory judgment pursuant to F.R.C.P. 57 and  28 U.S. Code § 2201, declaring the rights and other legal relations of the parties;  together with such other and further relief as may be just and proper

Dated: July 5, 2024

Respectfully Submitted,

/s/ Jonathan Wallace
Jonathan Wallace
PO #728
Amagansett NY 11930\
917-359-6234
jonathan.wallace80@gmail.com
(Admitted Pro Hac Vice)

Shahily Negron, Esq.
Attorney ID: 332842
The Law Firm of Shahily Negron, Esq.
d/b/a Negron Law
943 Washington Street
Reading, PA 19601
Phone: (646) 484-1491
Fax: (347) 814-1827
Email: shahily@lawnegron.com

Attorneys for Plaintiffs