UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA
----------------------------------------------------------x

HUDA FAKHREDDINE,
TROUTT POWELL,  and PENN
FACULTY  FOR JUSTICE IN PALESTINE,

                        Plaintiffs,                            **No. 2:24-cv-01034 (MSG)**

    -againt-

THE UNIVERSITY OF PENNSYLVANIA,

                        Defendants,

----------------------------------------------------------x

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS**

Jonathan Wallace
PO #728
Amagansett, NY 11930
917-359-6234
jonathan.wallace80@gmail.com
Attorney for Plaintiffs
Admittted *pro hac vice*

**TABLE OF CONTENTS**

**PRELIMINARY page 7**

**THE NEW MCCARTHYISM AT U PENN  page 10**

**ARGUMENT: THE STANDARD page 14**

**Point One: PLAINTIFFS HAVE STANDING
TO BRING THIS ACTION     page 14**

**Point Two: DEFENDANT IN ITS MOTION TO DISMISS
CONTINUES TO ASSERT HARM IS SPECULATIVE,
EVEN THOUGH THERE IS NOW PROOF OF AN
ALREADY SUBSTANTIAL IMPACT    page 16**

**Point Three: DEFENDANT IN ITS MOTION TO DISMISS IGNORES
THE *AT&T* CASE AND ITS PROGENY    page 19**

**Point Four: THE COMPLAINT STATES A CAUSE OF ACTION
FOR BREACH OF CONTRACT page 21**

**Point Five: THE COMPLAINT STATES A CAUSE OF ACTION
FOR CONSPIRACY     page 23**

**Point Six: THE OTHER CAUSES OF ACTION ALSO ARE
PLAUSIBLY PLEADED page 25**

**Point Seven: DEFENDANT IMPROPERLY ASKS THIS COURT TO
DECIDE DISPUTED FACT ISSUES    page 26**

**CONCLUSION   page 28**

# TABLE OF CASES

*Abdulhay v. Bethlehem Med. Arts, L.P.,* No. 03-CV-04347, 2004 U.S. Dist. LEXIS 5494, at *32 (E.D. Pa. Mar. 29, 2004)    page 23

*Aberle Hosiery Co. v. Am. Arbitration Asso.,* 461 F.2d 1005, 1006 (3d Cir. 1972) page 27

*Allegheny Reprod. Health Ctr. v. Pa. Dep't of Hum. Servs.,* 309 A.3d 808, 889, 901 (Pa. 2024) page 26

*Allegheny Val. Bank of Pittsburgh v Potomac Educ. Found., Inc.,* 2015 US Dist LEXIS 28364, at *11 (WD Pa Mar. 9, 2015, Civil Action No. 13-818) page 19

*Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) page 14

*Askew v. R.L. Reppert, Inc.,* 2016 U.S. Dist. LEXIS 136049, *64 (EDPA 2016) Page 10, fn. 6

*Associated Builders & Contractors W. Pa. v. Cmty. Coll. of Allegheny Cnty.*, 81 F.4th 279, 289 (3d Cir. 2023) page 28, fn. 27

*Bair v. Shippensburg Univ.,* 280 F. Supp. 2d 357, 365 (M.D. Pa. 2003) page 23

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007) page 14

*Bethel v. Jendoco Constr. Corp.,* 570 F.2d 1168, 1173 (3d Cir. 1978) page 23

*Brady v. Airgas, Inc.*, No. 15-4099, 2015 U.S. Dist. LEXIS 147293, at *12-13 (E.D. Pa. Oct. 30, 2015)    page 27

*Brody v. Hankin,* 145 Fed. Appx. 768, 772  (3rd Cir. 2005)  page 10, fn. 6

*Brookins v. City of Phila.,* No. 24-470, 2024 U.S. Dist. LEXIS 78244, at *12 (E.D. Pa. Apr. 30, 2024)    page 26

*Cavaliere v. Duff's Bus. Inst.,*  605 A.2d 397, 404 (Superior Court Pa. 1992) page 22

*Cohen v. Hot House Beauty LTD,* 2023 U.S. Dist. LEXIS 103816, *6 (WDPA 2023)  page 10 fn. 6

*Cole v. Trustees of Columbia University,* 300 F. Supp. 1026 (SDNY 1969) page 20

*Commack Self-Service Kosher Meats, Inc. v. Weiss,* 294 F.3d 415, 418 (2d Cir. 2002) page 13 fn. 15

*Commonwealth v. Sell,*  470 A.2d 457, 467 (Supreme Court Pa.1983) page 26

*Coulter v. United States,* No. 14-30 Erie, 2015 U.S. Dist. LEXIS 38429, at *8-9 (W.D. Pa. Feb. 13, 2015) page 27

*Ctr. for Investigative Reporting v. SEPTA,* 975 F.3d 300, 313 (3d Cir. 2020) page 26

*Davis v Wigen,* 82 F.4th 204, 209 (3d Cir 2023) page 20

*Dougherty v Quicksius, LLC,* 2016 US Dist LEXIS 91705, at *14 (ED Pa July 13, 2016) page 18

*Doe v. Columbia Univ.,* 831 F.3d 46, 57 (2nd Cir. 2016) page 12

*Doe v Univ. of the Sciences,* 961 F.3d 203, 210 (3d Cir. 2020) page 12

*Emergency Coalition to Defend Educ. Travel v United States Dept. of the Treasury,* 545 F3d 4, 10 (2008) page 15

*Farber v. City of Paterson,* 440 F.3d 131, 138 (3d Cir. 2006) page 23

*Ferrer v. Trs. of the Univ. of Pa.,* 825 A.2d 591, 604-05 (2002) p. 19 fn. 23

*Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist.,* 832 F.3d 469, 472-73 (3d Cir. 2016)  page 28

*Gati v. Univ. of Pittsburgh,* 91 A.3d 723, 730 (Superior Court Pa. 2014) page 22

*Gibbs v. City of Pittsburgh,* 989 F.3d 226, 230 (3d Cir. 2021) page 1

*Givens v. Wal-Mart Stores, Inc.,* No. 22-2989, 2023 U.S. App. LEXIS 28805, at *3 (3d Cir. Oct. 31, 2023) page 14

*Graham v. Mohegan Sun at Pocono Downs,* No. 3:14-CV-00908, 2017 U.S. Dist. LEXIS 227664, at *5 (M.D. Pa. July 25, 2017) page 28

*G.S. v. Penn-Trafford Sch. Dist.,* No. 20-3281, 2023 U.S. App. LEXIS 17611, at *2 (3d Cir. July 12, 2023) page 26

*Hassan v. City of N.Y.,* 804 F.3d 277, 301 (3d Cir. 2015) page 24

*Hazen v. Woodloch Pines Resort,* No. 3:21-cv-00174, 2024 U.S. Dist. LEXIS 27944, at *8 n.5 (M.D. Pa. Feb. 16, 2024) page 19, fn. 24

*Hickey v Univ. of Pittsburgh,* 77 F.4th 184, 194 (3d Cir 2023) page 21

*Ieradi v. Mylan Labs., Inc.,* 230 F.3d 594, 598 (3rd Cir. 2000) page 10, fn 6

*In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1418 (3d Cir.1997) page 18

*Jackson v. Direct Bldg. Supplies LLC,* No. 4:23-CV-01569, 2024 U.S. Dist. LEXIS 8811, at *23 (M.D. Pa. Jan. 17, 2024) page 18, fn. 21

*Jackson v Wright,* 82 F.4th 362, 369 (5th Cir 2023) page 14

*Jacobs v. Palmer,* No. 14-5797, 2015 U.S. Dist. LEXIS 28853, at *22 (E.D. Pa. Mar. 10, 2015) page 20, fn 25

*Johnson v. Dunkin' Donuts Franchising L.L.C.*, Civil Action No. 11-1117, 2012 U.S. Dist. LEXIS 69803, at *44 (W.D. Pa. May 18, 2012) page 27

*Kaper v. Pa. Game Comm'n,* No. 1:24-CV-164, 2024 U.S. Dist. LEXIS 182417, at *12 (M.D. Pa. Oct. 7, 2024) page 18, fn. 21

*Keller v. Connaught, Inc.,* CIVIL ACTION NO. 96-177, 1997 U.S. Dist. LEXIS 1251, at *4 (E.D. Pa. Feb. 6, 1997) page 28

*McFadden v. Apple Inc.,* 785 F. App'x 86 (3d Cir. 2019) page 24

*Md. Students for Just. in Palestine v. Bd. of Regents of the Univ. Sys. of Md.*, No. 24-2683 PJM, 2024 U.S. Dist. LEXIS 178359 (D. Md. Oct. 1, 2024) page 9

*Mohamed Sabra v. Maricopa Cnty. Cmty. Coll. Dist.,* 44 F.4th 867, 873 (9th Cir. 2022) page 5

*Monell v. Dep't of Soc. Servs.,* 436 U.S. 658  (1978) page 20

*Mucy v. Nagy,* Civil Action No. 20-1950, 2021 U.S. Dist. LEXIS 144654, at *29-30 (W.D. Pa. Aug. 3, 2021) page 27

*Nolt v City of Phila.,* 2024 US Dist LEXIS 57372, at *10-11 (ED Pa Mar. 29, 2024, No. 23-0864)   page 20

*Parson v Farley,* 352 F Supp 3d 1141, 1148 (ND Okla 2018), affirmed 800 F. App'x 617 (10th Cir. 2020), *cert den,*   141 S. Ct. 116 (2020) page 15

*Pa. Psychiatric Soc'y v. Green Spring Health Servs.,* 280 F.3d 278, 289 (3d Cir. 2002), *cert. den.* 537 U.S. 881 (2002) page 19 fn. 24

*Pernell v Florida Bd. of Governors of the State Univ. Sys.,* 2022 US Dist LEXIS 243016, at *8 (ND Fla Nov. 22, 2022, No. 4:22cv304-MW/MAF) page 14

*Phillips v. Trello,* 502 F.2d 1000, 1005 (3d Cir. 1974) page 23

*Pub. Interest Research Grp. v. Powell Duffryn Terminals,* 913 F.2d 64, 71 (3d Cir. 1990), cert. den. 498 U.S. 1109 (1991) page 19 fn. 22

*Riv. Rd. Dev. Corp. v Carlson Corp. - Northeast,* 1990 US Dist LEXIS 6201, at *28-29 (ED Pa May 23, 1990, Civil Action No. 89-7037) page 18

*Rose v. Guanowsky,* No. 21-3280, 2022 U.S. App. LEXIS 8189, at *3 (3d Cir. Mar. 29, 2022) page 23

*Rockefeller Ctr. Props. Sec. Litig. v Rockefeller,* 311 F3d 198, 216 (3d Cir 2002) page 18

*Rumsfeld v Forum for Academic & Inst. Rights, Inc.,* 547 US 47, 52, n 2 (2006) page 15

*SanMedica Intl. v Amazon.com Inc.,* 2015 US Dist LEXIS 148775, at *7-10 (D Utah Nov. 2, 2015, No. 2:13-cv-00169) page 15

*Scott v. Sandford,* 60 U.S. 393, 407 (1857) p. 8, fn 1

*Students for Just. in Palestine v. Abbott,* No. 1:24-CV-523-RP, 2024 U.S. Dist. LEXIS 196180 (W.D. Tex. Oct. 28  2024) page 9, fn 4

*Suppan v. Dadonna,* 203 F.3d 228, 230 (3d Cir. 2000) page 23

*Swartley v. Hoffner,* 734 A.2d 915, 919  (Superior Court Pa. 1999) page 22

*Tannous v. Cabrini Univ.,* No. 23-1115, 2023 U.S. Dist. LEXIS 179616, at *18-19 (E.D. Pa. Oct. 4, 2023) page 21

*Terminix Int'l Co., L.P. v. Kay,* 150 F.R.D. 532, 537 (E.D. Pa. 1993) p. 20 fn. 25

*Thomas v. Indep. Twp.*, 463 F.3d 285, 298 (3d Cir. 2006) page 23

*Trump v. Mazars USA, LLP,* 140 S. Ct. 2019, 2028 (2020)  page 20

*United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 830 (1983) page 23

*United States v AT&T,* 419 F Supp 454 (D. D.C. 1976), *remanded for attempted settlement,*  551 F.2d 384 (1976)*, affirmed* 567 F.2d 121 (D.C. Cir. 1977) page 20

*United States v. Berkeley Heartlab, Inc.,* Civil Action No. 9:14-cv-00230-RMG, 2018 U.S. Dist. LEXIS 6225, at *7 (D.S.C. Jan. 12, 2018) page 27, fn 26

*Vey v. Amazon.com,* Civil Action No. 2:23-cv-2055, 2024 U.S. Dist. LEXIS 92695, at *5 (W.D. Pa. May 23, 2024)   p. 18 fn. 21

*Yarnall v. Phila. Sch. Dist.,* No. 11-3130, 2013 U.S. Dist. LEXIS 48716, at *26 (E.D. Pa. Apr. 4, 2013) p. 26

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA
----------------------------------------------------------x

HUDA FAKHREDDINE,
TROUTT POWELL,  and PENN
FACULTY  FOR JUSTICE IN PALESTINE,

                    Plaintiffs,                      **No. 2:24-cv-01034 (MSG)**

      -againt-

THE UNIVERSITY OF PENNSYLVANIA,

                    Defendants,

----------------------------------------------------------x

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS**

Plaintiffs, by their counsel Jonathan Wallace, submit this Memorandum of Law in opposition to the Motion to Dismiss.

**PRELIMINARY**

Consider a hypothetical: A woman sees a physician, with whom she shares certain confidential details about her health, which he keeps in a confidential file. A powerful politician, who detests the patient and wants to harm her in any way possible,  bullies the physician into giving him a copy of the file. The woman discovers this and brings a lawsuit that the doctor has violated their contract, his legal duty to her, and the HIPAA laws.  The doctor moves to dismiss on the grounds that he did not harm his patient by releasing her most private and confidential information to her dire enemy.

Consider another: a bulldozer is aimed at a house, and the homeowner rushes to court to obtain an injunction. The defendant, however, argues that the injunction should be denied because the harm is"speculative": the bulldozer, one hundred feet from the house and moving steadily, may still stop, or turn right or left.

These hypotheticals are legally, factually, and morally indistinguishable from the present case.

Defendant's counsel makes a truly extraordinary statement in his Memorandum, worth quoting in full: "The issues Plaintiffs raise are important. Penn—like other universities around the country—must navigate balancing core principles of academic freedom with its earnest commitment to ensuring that all members of its community are safe and can participate in university life. And while it seems like everyone with a perspective on these debates has found their way to this federal court, these are not issues aided through the lens of civil litigation. The Court should dismiss the amended complaint with prejudice". (Document #47).[1] "[T]hese are not issues aided through the lens of civil litigation", really? A search on cases in which universities are sued by faculty and students harmed by capricious, unconstitutional or contract-breaching peremptory decisions about academic freedom, "safety", and participation in university life will produce thousands of federal and state cases dealing with controversies as varied as McCarthyism, Vietnam war protests, apartheid, Occupy Wall Street, Black Lives Matter, gun rights, abortion, use of mandatory student fees, HIPAA and FERPA rights, and a hundred other topics. Under each of these headings are a majority of cases in which plaintiffs demonstrated actual harm and were held to have standing. The claim that all such litigation is frivolous and futile, actually translates into an assertion that universities should be trusted absolutely, and that their faculty and students should have no recourse-- a statement itself which is horrifyingly inconsistent with the entire concept of academic freedom, and in fact with the very purpose of a liberal arts university.[2]

In early October, a federal district court in Maryland decided *Univ. of Md. Students for Just. in Palestine v. Bd. of Regents of the Univ. Sys. of Md.* The Court granted a mandatory preliminary injunction permitting the plaintiffs to hold a pro-Palestinian demonstration on the grounds of a public

---

[1]     Counsel in effect states, as he does through-out his motion, that U Penn faculty and students have "no rights which the [university] was bound to respect", *Scott v. Sandford,* 60 U.S. 393, 407 (1857).

[2]     The Court may also take note of the Defendant's use of a quote from an essay of Dr. Fakhreddine, taken entirely out of context, which they saw fit to reference in their Memorandum (p. 5), for the proposition that she had given the House

university on October 7, 2024. The arguments used by the University of Maryland in defense of its attempt to prohibit the action were exactly the "safety" and "participation" alleged above: "At the Preliminary Injunction hearing, Chief Mitchell testified, as part of his security assessment of SJP's proposed vigil, that—given that McKeldin Mall is hard to secure due to its location and size—he could not guarantee student and faculty safety on October 7...Individuals and groups opposing SJP's proposed October 7 event take further offense by reason of the event's likely references to the Hamas fighters as patriots, martyrs, or freedom fighters, and by at least one slogan arguably interpreted to call for the extinction of Israel ('From the river to the sea'). Numerous university students, parents, alumni, donors, and members of the public have expressed passionate opposition to the event. But like them or not, these very terms appear in the media virtually daily. They are expressive of ideas, however vile they may seem to some. There is no reason why they should not be given protection as speech when they are used in the forum of a public university".   *Univ. of Md. Students for Just. in Palestine v. Bd. of Regents of the Univ. Sys. of Md.,* No. 24-2683 PJM, 2024 U.S. Dist. LEXIS 178359, at *18, 22 (D. Md. Oct. 1, 2024). [3] Had the District Court agreed with U Penn's proposition that father knows best, and that "these are not issues aided through the lens of civil litigation", it could never have granted an injunction securing SJP's First Amendment rights. [4]

---

Committee permission to root around in her files. The essay, attached as Exhbit 2 to the motion, continues on: "[A]s they dig into my information, violating my privacy and my First Amendment rights...." There is no legal theory on which this document has any bearing in a motion to dismiss; as purported evidence of waiver or consent it would only raise a disputed fact issue. It is, of course, in these freakish times,  more likely that counsel attached it to impugn Dr. Fakhreddine as a dangerous radical (as a bad human who deserves dismissal). That backfired. The essay, radiating humanity and compassion, gives some background on Plaintiff and the historical context.

[3]    The undersigned, who has represented many SJP chapters but was not involved in the Maryland case, believes that assertions by Plaintiffs about praise of Hamas or calls for the extinction of Israel will not be sustained by the evidence at trial.

[4] In *Students for Just. in Palestine v. Abbott,* No. 1:24-CV-523-RP, 2024 U.S. Dist. LEXIS 196180 (W.D. Tex. Oct. 28 2024), decided less than three weeks ago, the district court denied the University of Houston's motion to dismiss a claim by the Students for Justice in Palestine.

## THE NEW MCCARTHYISM[5] AT U PENN[6]

University of Pennsylvania ("U Penn") is not a hostile environment for Jewish people, but has been accused of tolerating antisemitism mainly by people offended by the First Amendment-protected speech of critics of Israel within the academic community.[7] U Penn has been under severe pressure not only by the House Committee, but by billionaire donors,[8] right wing media,[9] and also some members of its own community,[10] to punish or end criticism of Israel and pro-Palestinian speech by other

---

[5]   See Amended Complaint, paragraphs 1-2; 4; 34; 88; 104; 133; 135; 152-154.

[6]   Apropos of cites below to newspaper articles, this Court may take judicial notice, *Ieradi v. Mylan Labs., Inc.,* 230 F.3d 594, 598 (3rd Cir. 2000) "We take judicial notice... of an article in the *New York Times*"); *Cohen v. Hot House Beauty LTD,* 2023 U.S. Dist. LEXIS 103816, *6 (WDPA 2023) Taking judicial notice of "publicly available web pages" whose "authenticity" was not disputed. The court may also note that these articles are not cited for the truth of any assertions, but for their existence, *Brody v. Hankin,* 145 Fed. Appx. 768, 772 (3rd Cir. 2005) ("On a motion to dismiss, we may take judicial notice of another court's opinion -- not for the truth of the matter asserted, but for the existence of the opinion"); *Askew v. R.L. Reppert, Inc.,* 2016 U.S. Dist. LEXIS 136049, *64 (EDPA 2016) 9 ("As matters of public record, I take judicial notice of them, not for the truth of the matter but that they are mutually consistent").

[7]   Amended Complaint paragraph 3.

[8]   "Antisemitism on US campuses is bleeding into anti-Americanism, explained Marc Rowan, CEO of Apollo Global Management...Rowan, a billionaire investor and philanthropist, is the largest donor to the University of Pennsylvania, his alma mater. In 2023, following accusations of antisemitism on campus, he helped spearhead a campaign to fire university president Liz Magill....'The vast majority of this country is normal – totally normal,' he said. 'Every poll everywhere done says that this country believes in right and wrong, moral and immoral. People are interested in family and career and friends, and are patriotic. That's the good news. The bad news is that there are centers – important centers – of this country that don't believe these things.' These centers, Rowan said, want to change everything about society, from the way people relate to each other to history and the notion of the American dream and meritocracy. 'They seek to sort us into groups based on a perception – their own perception – of whether we are an oppressed or an oppressor,' he said. 'That's the fight we have on these campuses.'". "UPenn's top donor: Campus antisemitism is bleeding into anti-Americanism", Jerusalem Post, June 5, 2024 https://www.jpost.com/diaspora/antisemitism/article-805107 "Two major University donors who criticized Penn President Liz Magill over antisemitism are hosting a fundraiser for the House of Representatives Republican who brought Magill before Congress,....Rep. Virginia Foxx (R-N.C.), the chair of the House Committee on Education and the Workforce.... is being backed by Wharton Board of Advisors Chair Marc Rowan and billionaire Ronald Lauder — prominent Penn alumni who played a significant role in the events leading up to Magill's resignation last week" . Jared Mitovich, The Daily Pennsylvanian December 20, 2023 https://www.thedp.com/article/2023/12/penn-donor-fundraiser-house-committee-antisemitism

[9]   The New York Post, owned by Rupert Murdoch, has routinely targeted publicly unknown college students in their twenties, publishing their photographs and personal information, and as a result summoning down anonymous death threats and hate speech upon then. The Post has also targeted U Penn, see Katherine Donlevy and Olivia Land, "UPenn alumni demand eight professors be punished for antisemitic 'hate speech'", *The New York Post,* April 16, 2024 https://nypost.com/2024/04/16/us-news/upenn-alumni-demand-eight-profs-be-punished-for-antisemitism/ – in which, as a curious example of the " spewing [of] antisemitic 'hate speech'" , the Post offers a screen shot of a post by plaintiff Fakhreddine which states, in solidarity with Jewish people critical of Israel: "The assumption that all Jewish people condone the genocidal Zionist project in Palestine is the epitome of antisemitism and a desecration of the memory of Holocaust martyrs".

[10]   "A group of Penn students and alumni recommended punishment for eight Penn professors allegedly involved in antisemitic behavior in a letter to Interim Penn President Larry Jameson....The letter specifically cites eight professors against whom they recommend the University should take action....includ[ing] political science professor Anne Norton,

members of the U Penn community.

The American Association of University Professors, a venerable organization originally founded in 1915 to protect academic freedom against a World War I onslaught of censorship, and a frequent amicus in federal cases, issued a March 2022 statement: "The past few years have seen an increase in partisan political attempts to restrict the public education curriculum and to portray some forms of public education as a social harm.[11] Two targets are particularly evident: teaching about the history, policies, and actions of the state of Israel and teaching about the history and perpetuation of racism and other accounts of state-enabled violence in the United States. In both cases, conservative politicians have justified restrictive legislation under the guise of protecting students from harm, including discriminatory treatment or exclusion. In the first case, legislation defines antisemitism to include political criticism of the state of Israel. In the second, legislation defines critical analysis of the history of slavery and its legacies in US society as being itself racially discriminatory against whites. In this way, politicians obfuscate or deny the serious challenges their actions pose to free speech and academic freedom. The evident purpose of such legislation is to protect Israel or the United States from critical examination of their history and policies". "Legislative Threats to Academic Freedom: Redefinitions of Antisemitism and Racism", *AAUP* https://www.aaup.org/report/legislative-threats-academic-freedom-redefinitions-antisemitism-and-racism AAUP's U Penn chapter in an April 23, 2024 statement called out "the capricious and one-sided suppression of dissent at Penn this year, most recently seen in the unjustified ban of the student group Penn Against the Occupation. The sheer volume of administrative actions in violation of university statutes, shared governance, and faculty and student rights is too large to catalog in this statement, which itself reveals the perilous environment university administrations

---

Christopher H. Browne Distinguished Professor of History Eve Troutt Powell, [and] Arabic literature professor Huda Fakhreddine". Vivi Sankar, "Alumni demand Penn take action against eight professors, citing alleged antisemitic conduct", *The Daily Pennsylvanian,* April 22, 2024 https://www.thedp.com/article/2024/04/penn-alumni-letter-faculty-investigation

[11] Amended Complaint, paragraphs 17; 116; 134.

have created on our campuses. Notably, these administrations have repeatedly and consistently shown themselves to be biased in their selective suppression of students and faculty critical of Israel's war on Palestinians, often apparently at the behest of right-wing donors, politicians, alumni, and lobbying groups". "Statement by AAUP-Penn Executive Committee on the Repression of Student and Faculty Dissent" https://aaup-penn.org/category/statements/

   Because of this pressure,[12] U Penn administrators have feared standing up to accusations of antisemitism or questioning the definition used.[13] The Amended Complaint plausibly and in detail asserts that U Penn has caved in to this pressure in violating their rights of academic freedom under University manuals, and federal and state law, *Doe v. Columbia Univ.,* 831 F.3d 46, 57 (2nd Cir. 2016) ("[T]he Complaint alleges that during the period preceding the disciplinary hearing, there was substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students.... Against this factual background, it is entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault"); *Doe v Univ. of the Sciences,* 961 F.3d 203, 210 (3d Cir. 2020) ("[A]lleged university overreaction to ….public pressure is relevant to alleging a plausible....discrimination claim".).

   U Penn has suspended and terminated faculty, students and staff for their exercise of their academic freedom and even the exercise of their First Amendment rights off campus. The University has singled out speech against Israeli violence in Gaza for treatment completely different than any other campus protest against war or violence. Criticism of the Russian invasion in Ukraine would not be construed as national origin bias against Russian people, yet any criticism of Israeli violence in Gaza is completely illogically and inappropriately deemed antisemitism. Many members of the U Penn

---

[12] Amended Complaint paragraph 33.
[13] Amended Complaint, paragraph 7.

community protesting Israel's violence in Palestine are themselves Jewish, such as  Hilah Kohen whose affidavit is submitted herewith; they do not identify anti-Zionism with antisemitism. Supports of Israeli violence in Gaza  routinely file complaints against these Jewish people, also accusing them of being antisemites-- demonstrating that a Court (itself a government actor) ruling explicitly that U Penn's activities are consistent with its student code and with federal law, is at the same time intervening in an internal dispute about the definition of Judaism, and in fact privileging one Jewish group over others,[14] a violation of the Establishment Clause.[15]

On August 20, 2024, after the Court's decision on the First Motion to Dismiss and the filing of the Amended Complaint, the undersigned received an email from Defendant's counsel David Gringer, quoted in full in the letter he filed with this Court on August 22 (Document #41): ""Counsel, Penn recently received a request from the U.S. House Committee on Education and the Workforce to produce from Ms. Fakhreddine, 'C.V./Resumes, all syllabi since the fall 2022 semester, all course-wide communications for courses since the fall 2023 semester, and any communications since 8/1/23 relating to the Gaza Solidarity Encampment, Faculty for Justice in Palestine, and/or the Palestine Writes Festival.' The Committee also asked 'that we inform them by this Friday, August 23 whether Ms. Fakhreddine will 'agree[] to cooperate and produce responsive materials through WilmerHale, and if not, [to] please provide [the Committee] contact information for their attorneys.' The University intends to produce to the Committee Ms. Fakhreddine's CVs and syllabi for her courses since the Fall 2022 semester. With respect to the Committee's remaining requests, please let us know whether Ms.

---

[14]    Amended Complaint, paragraph 111.

[15]    The argument that Zionism and a right to the Holy Land  are cornerstones of the Jewish religion ignores that two other faiths, Christian and Muslim, also formulated such claims to the same land, so that a finding by a Court or legislature that anti-Zionism is antisemitism would violate the Establishment Clause by enacting one religious claim into law and penalizing competing religious claims,  *Commack Self-Service Kosher Meats, Inc. v. Weiss,* 294 F.3d 415, 418 (2d Cir. 2002) (state law enforcing Orthodox Jewish standards for foods sold as "kosher" violated First Amendment by privileging one Jewish group over others).

Fakhreddine will provide communications responsive to the Committee's request by Friday, August 23 by 3PM ET.'" We declined to do so.

## ARGUMENT

## THE STANDARD

When deciding a motion to dismiss, the court must "accept as true a complaint's factual allegations and view them in the light most favorable to the plaintiff", *Givens v. Wal-Mart Stores, Inc.,* No. 22-2989, 2023 U.S. App. LEXIS 28805, at *3 (3d Cir. Oct. 31, 2023).[16]   The court will not dismiss any claims pursuant to Rule 12(b)(6) unless the plaintiff has failed to plead sufficient facts to state a facially plausible claim for relief, *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).To state a plausible claim, plaintiff must provide "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged", *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009), and must give the defendant "fair notice of his claim", *Gibbs v. City of Pittsburgh,* 989 F.3d 226, 230 (3d Cir. 2021) [17]

## Point One

## PLAINTIFFS HAVE STANDING TO BRING THIS ACTION

Defendant's  assertion that all Plaintiffs lack standing to bring this action is a curious one, considering they are suing their own employer to enjoin it from harming them, *Pernell v Florida Bd. of Governors of the State Univ. Sys.,* 2022 US Dist LEXIS 243016, at *8 (ND Fla Nov. 22, 2022, No. 4:22cv304-MW/MAF) ("This Court determined that the [professor] Plaintiffs....had established standing for purposes of a preliminary injunction against the members of the Board of Governors"); *Jackson v Wright,* 82 F.4th 362, 369 (5th Cir 2023) ("Specifically, he alleges that the chair of his

---

[16]   Citations given are "cleaned up" by the elimination of internal quotes and brackets.
[17]   Defendant omits the motion to dismiss standard from its brief, possibly because it asks this Court to disregard it.

department told him that the university would eliminate resources previously provided to the Journal and the Center. At the motion to dismiss stage where we must accept all Jackson's allegations as true, he has plainly alleged both a continuing and a future injury sufficient to confer standing for him to seek prospective relief").

Individual professors moving to intervene in various controversies have been found to have Article III standing in circumstances much more nebulous or tangential than this instant case, *Parson v Farley,* 352 F Supp 3d 1141, 1148 (ND Okla 2018), *affirmed* 800 F. App'x 617 (10th Cir. 2020), *cert den*, 141 S. Ct. 116 (2020) ("[Professor] Volokh has established independent Article III standing to intervene for the limited purpose of seeking public access to judicial records...[B]ut for the Sealing Order, Volokh would be able to gather information from the record and disseminate his opinion regarding this litigation through his blog"); *SanMedica Intl. v Amazon.com Inc.,* 2015 US Dist LEXIS 148775, at *7-10 (D Utah Nov. 2, 2015, No. 2:13-cv-00169) ("Professor Tushnet...alleges that were it not for the protective order she would be able to gather the information from the public opinion and disseminate her opinion on it through her blog"). These professors in pursuit of academic freedom were granted standing against unrelated parties, while Defendant does not appear to believe that Plaintiffs have standing to complain of acute damage to academic freedom in their own institution.

Similarly, associations of professors easily obtain organizational standing, *Rumsfeld v Forum for Academic & Inst. Rights, Inc.,* 547 US 47, 52, n 2 (2006) ("[W]e...agree that FAIR has standing"); *Emergency Coalition to Defend Educ. Travel v United States Dept. of the Treasury,* 545 F3d 4, 10 (2008) ("In considering standing, we must assume the merits in favor of the party invoking our jurisdiction"). It is particularly strange that Defendant argues that the Plaintiffs lack standing to complain that their employer is releasing their confidential information or harming their academic freedom, when even outside organizations have been granted standing against universities when their actual harm was less immediate, *Mohamed Sabra v. Maricopa Cnty. Cmty. Coll. Dist.,* 44 F.4th 867,

15

873 (9th Cir. 2022) (**"**CAIR-AZ, a non-profit organization that advocates for the civil rights of American Muslims, alleged that Damask's actions frustrated its mission and caused it to divert resources in order to combat Damask's distorted portrayal of Islam. At the motion-to-dismiss stage, these allegations are sufficient to establish organizational standing").[18] However, if the Court found that only plaintiff Fakhreddine had standing, that would be sufficient of course for the Complaint to survive the motion. "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement", *Rumsfeld, supra.*[19]

In its Article III standing argument, the Defendant appears to make an egregious ontological error, confusing the merits of the case with the question of standing, *Emergency Coalition, supra* ("[T]he Government is mixing a merits question into the standing analysis, which is improper").

### Point Two

### DEFENDANT IN ITS MOTION TO DISMISS CONTINUES TO ASSERT HARM IS SPECULATIVE, EVEN THOUGH THERE IS NOW PROOF OF AN ALREADY SUBSTANTIAL IMPACT

Defendant's continued assertion that harm is "speculative" (Memorandum p. 4) is a word game familiar to "movement" attorneys bringing controversial cases involving causes offensive to public opinion, defense counsel, despite the stirring array of very specific assertions of harm made in the Complaint, always claim that that these pleadings are "speculative" and fail the *Bell Atlantic-Twombly* standard.

This is specious. Plaintiff's Amended Complaint, filed July 8, 2024 (Document #35) states: "Plaintiff Huda Fakhreddine has been personally threatened, her safety endangered, by the making of

---

[18] Plaintiffs have certainly had to "divert resources" to "combat" Defendant's "distorted portrayal of Islam".

[19] The individual Plaintiffs are of course members of the PFJP, Complaint, paragraph 91.

false accusations against her by the House Committee. By giving them more confidential documents about her, Penn is assisting the House Committee in continuing to target, oppress and harm Dr. Fakhreddine" (paragraph 16), then continues for many paragraphs giving examples of House Committee speech and behavior impacting Dr. Fakhreddine. At paragraph 56, Plaintiffs allege: "Asked by the House Committee for information that it can distort, twist and misrepresent in an attempt to invoke death threats and hate speech directed at Dr. Fakhreddine, and also to end her career, Penn is voluntarily complying". "In their letter to Penn counsel on January 30, 2024, the undersigned specifically warned Penn that its compliance with the Information letter would inevitably lead to increased harassment, hate, and threats,causing Dr. Fakhreddine and her family to fear for their safety. Penn complied anyway" (paragraphs 57-58). "Penn by disclosing documents to the House Committee is cooperating with, consenting to and co-conspiring with regard to these vicious and dangerous attacks on Plaintiff Fakhreddine.... Plaintiff Fakhreddine has in fact received numerous such violent, hateful, threatening and dangerous communications since, and as a result of, being doxxed by the House Committee". (paragraphs 78-80). "The relentless characterization of the individual Plaintiffs and members of the PFJP as anti-Semitic (which they are not) has already, in addition to the hatred expressed against them, also created an environment of profound danger, fear and distrust, in which it is impossible to enjoy any semblance of academic freedom....Plaintiff Fakhreddine has been excluded from faculty meetings, her emails to the members of her department censored, and co-sponsorship of events canceled....Professors, at Penn... are left wondering whether it is any longer safe to teach courses about the history of colonialism, or to present a nuanced view in a classroom of the history of the Middle East". (paragraphs 128-133). All of these assertions clearly are more than adequately specific (and not "speculative")  to state a cause of action which withstands a motion to dismiss.

Defendant in any event, does not deny that it has at this point substantially complied with the

Information Letter; see for example Point C of their Memorandum at pages 3-4 and the undersigned's August 22, 2024 letter to this Court (Document #41) (indicating its intent to produce more unredacted documents about Dr. Fakhreddine within few days).  T^he University, with full knowledge of what it has actually produced, regarding Fakhreddine and other Plaintiffs, continues to claim there is no proof that any of these unknown documents are harmful. [20] Remaining mysterious about matters of which it is exclusively and fully aware, it leverages its own withholding of information to accuse Plaintiffs of making "speculative" wild claims which fail to establish a cause of action or irreparable harm.

 "Where it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control,... rigid [pleading] requirements  may be relaxed", *Rockefeller Ctr. Props. Sec. Litig. v Rockefeller,* 311 F3d 198, 216 (3d Cir 2002); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir.1997) ("Accordingly, the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control"); *Riv. Rd. Dev. Corp. v Carlson Corp. - Northeast,* 1990 US Dist LEXIS 6201, at *28-29 (ED Pa May 23, 1990, Civil Action No. 89-7037) ("I do not believe it necessary for Carlson to identify specific dates and amounts of these conveyances at this time, because this information is peculiarly within the knowledge of counterclaim defendants").[21]  In a matter in which a defendant is withholding facts necessary to the decision of a dispositive motion, this Court also has discretion to deny the motion pending discovery, *Dougherty v Quicksius, LLC,* 2016 US Dist LEXIS 91705, at *14 (ED Pa July 13, 2016, No. 15-6432) ("Rather, such matters are particularly within the knowledge of Defendant and Plaintiff is not expected to plead such matters with specificity absent the benefit of discovery");

---

[20]  This would have been Defendant's opportunity for example to assert that it had not produced any documents pertaining to Fakhreddine, was not planning to, that the case was moot, etc.

[21]  Contrary to the Defendant's assertions, this very common sense and practical rule is not limited  to fraud claims, *Kaper v. Pa. Game Comm'n,* No. 1:24-CV-164, 2024 U.S. Dist. LEXIS 182417, at *12 (M.D. Pa. Oct. 7, 2024) (ADA case); *Jackson v. Direct Bldg. Supplies LLC,* No. 4:23-CV-01569, 2024 U.S. Dist. LEXIS 8811, at *23 (M.D. Pa. Jan. 17, 2024) (consumer protection); . *Vey v. Amazon.com,* Civil Action No. 2:23-cv-2055, 2024 U.S. Dist. LEXIS 92695, at *5 (W.D. Pa. May 23, 2024) (breach of warranty).

*Allegheny Val. Bank of Pittsburgh v Potomac Educ. Found., Inc.,* 2015 US Dist LEXIS 28364, at *11 (WD Pa Mar. 9, 2015, Civil Action No. 13-818) ("[T]his Court must ask whether the facts alleged raise a reasonable expectation that discovery will reveal evidence of the necessary elements").

Additionally, the Plaintiffs submit three affidavits on the issue of standing[22]. That of plaintiff Huda Fakhreddine clearly and with great specificity asserts that U Penn's provision of information about her to the House Committee supported and enabled their defamatory attacks on her as an "antisemite", and must be seen in context with her assertions that Penn, frightened by the House Committee, has canceled events, censored her communications with faculty, and directed her to preserve all her personal, private communications, for later disclosure to the House Committee-- exerting a profound chilling effect.[23] The affidavits of students Hilah Kohen and Taja Maza[24] also clearly establish the chilling effect on advocacy and even on defending oneself in a student disciplinary proceeding of their awareness that their disciplinary files were being voluntarily released to the House Committee by U Penn.

### Point Three

### DEFENDANT IN ITS MOTION TO DISMISS IGNORES THE *AT&T* CASE AND ITS PROGENY

Defendant argues it is not a state actor. This is a non sequitur. Federal question jurisdiction

---

[22]   Though limited in their use in other kinds of motions to dismiss, affidavits are appropriate to refute claims of lack of standing, *Pub. Interest Research Grp. v. Powell Duffryn Terminals,* 913 F.2d 64, 71 (3d Cir. 1990), cert. den. 498 U.S. 1109 (1991).

[23]   Since *AT&T* creates federal question jurisdiction over House requests for information, Plaintiffs can assert that U Penn has aided or conspired with the House in violating Dr. Fakhreddine's First Amendment rights, even though U Penn itself is not a state actor. But the assertion of a chill is also relevant to Plaintiff's breach of contract/ academic freedom claim, *Ferrer v. Trs. of the Univ. of Pa.,* 825 A.2d 591, 604-05 (2002).

[24]   Plaintiffs do not assert that the two students are members of PFJP. These affidavits are nonetheless relevant and admissible on the grounds PFJP faculty may represent the rights of student non-members consistent with a mission to protect their students who are at risk or being harmed for pro-Palestinian expression,  *Pa. Psychiatric Soc'y v. Green Spring Health Servs.,* 280 F.3d 278, 289 (3d Cir. 2002), *cert. den.* 537 U.S. 881 (2002). Also, given that parties  bringing or responding to motions use affidavits of nonparty witnesses supporting their assertions on a wide variety of fact issues, there is no requirement that a litigant can only use affidavits of plaintiffs or organizational members to, establish general facts or context on a dispositive motion, *Hazen v. Woodloch Pines Resort,* No. 3:21-cv-00174, 2024 U.S. Dist. LEXIS 27944, at *8 n.5 (M.D. Pa. Feb. 16, 2024) (use of " deposition testimony by various nonparty witnesses" on summary judgment).

regarding this case is established by *United States v AT&T*, 419 F Supp 454 (D. D.C. 1976), *remanded for attempted settlement,* 551 F.2d 384 (1976)*, affirmed* 567 F.2d 121 (D.C. Cir. 1977), and progeny-- case law which Defendant never attempts to rebut or distinguish.[25] After years of confusion about whether a plaintiff could sue to quash a Congressional subpoena issued to a third party, *Cole v. Trustees of Columbia University,* 300 F. Supp. 1026 (SDNY 1969), *AT&T* definitively resolved that, given Congressional immunity under the Speech and Debate Clause, a plaintiff could properly sue the subpoena recipient without naming Congress. Constitutional arguments then may be used against the non-state actor third party-- and Congress can always choose to intervene as of right to answer them, as a committee chairperson did in fact do in *AT&T*. Almost fifty years later, *AT&T* is still good law, *Trump v. Mazars USA, LLP,* 140 S. Ct. 2019, 2028 (2020) ("Although named as defendants, Mazars and the banks took no positions on the legal issues in these cases, and the House committees intervened to defend the subpoenas"). The AT&T solution is a workaround of the kind in which federal courts are adept, similar to *Monell's* solution to another sovereign immunity issue, *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978).

The *AT&T* line of cases renders nugatory Defendant's arguments about state action and Constitutional issues. However, if Plaintiffs were trying to prove state control of Defendant, for the purpose of asserting Constitutional rights, they might be able to do so, *Davis v Wigen,* 82 F.4th 204, 209 (3d Cir 2023)( "[P]rivate parties engaging in the federal equivalent of state action, like the private prison here, may be subject to Bivens liability"); *Nolt v City of Phila.,* 2024 US Dist LEXIS 57372, at *10-11 (ED Pa Mar. 29, 2024, No. 23-0864) ("The Third Circuit has identified three different tests arising under Supreme Court jurisprudence to determine whether that nexus between state and private

---

[25] Failure to cite controlling authority has been considered a Rule 11 violation, *Terminix Int'l Co., L.P. v. Kay,* 150 F.R.D. 532, 537 (E.D. Pa. 1993) ("A party's position, even if superficially plausible, cannot be accepted as a good faith argument...if, in framing the pleadings, the party ignores the controlling authority"); *Jacobs v. Palmer,* No. 14-5797, 2015 U.S. Dist. LEXIS 28853, at *22 (E.D. Pa. Mar. 10, 2015) (OSC issued as to why "attorney's fees and costs should not be awarded to Defendants due to Plaintiffs' failure to cite to any current, post-*Twombly* precedential case law").

conduct exists: (1) whether the private actor was delegated a traditionally and exclusively state function (the public function test); (2) whether the private actor has acted  in concert with state officials (the close nexus test); and (3) whether the State has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity (the symbiotic relationship test)").  Defendant is certainly acting in concert with the Committee, and may even be symbiotic with it.

**Point Four**

**THE COMPLAINT STATES A CAUSE OF ACTION FOR BREACH OF CONTRACT**

The  Third Circuit has recognized a university's  duty to keep the promises on which members of the academic community relied in making their choice to join, *Hickey v Univ. of Pittsburgh,* 77 F.4th 184, 194 (3d Cir 2023) ("Pennsylvania courts have recognized that students may bring breach of contract claims for specific undertakings that a university promised but failed to deliver, such as a certain curriculum, accreditation, or degree"). A university's implied obligation of good faith and fair dealing under Pennsylvania law obliges it to keep the promises it makes about academic freedom in its Faculty handbook, *Tannous v. Cabrini Univ.,* No. 23-1115, 2023 U.S. Dist. LEXIS 179616, at *18-19 (E.D. Pa. Oct. 4, 2023) (Complaint survived motion to dismiss which alleged that  "the faculty handbook made a promise of continued employment consistent with an obligation of good faith and fair dealing, which in context also included complying with general principles of academic freedom"). Defendant's Faculty Handbook, attached to its motion to dismiss as Exhibit 4, states in Section IIA, "Academic Freedom and Responsibility": "The University recognizes the importance of a system of tenure for faculty members as the preeminent means of fostering and protecting academic freedom in teaching and in scholarly inquiry....It is the policy of the University of Pennsylvania to maintain and encourage freedom of inquiry, discourse, teaching, research, and publication and to protect any member of the academic staff against influences, from within or without the University, which would restrict

21

a member of the academic staff in the exercise of these freedoms in their area of scholarly interest".

These cases rely on state jurisprudence such as *Swartley v. Hoffner, 734* A.2d 915, 919 (Superior Court Pa. 1999) ("[T]he relationship between a private educational institution and an enrolled student is contractual in nature; therefore, a student can bring a cause of action against said institution for breach of contract where the institution ignores or violates portions of the written contract");*Cavaliere v. Duff's Bus. Inst.,* 605 A.2d 397, 404 (Superior Court Pa. 1992) ("We can fathom no policy against permitting a cause of action for breach of contract or misrepresentation where...the nature of the contractual undertaking and the breach thereof are clear and the plaintiff may be able to establish a cause of action against the offending institution"); *Gati v. Univ. of Pittsburgh,* 91 A.3d 723, 730 (Superior Court Pa. 2014) ("In the case of a dispute between a student and a private school, Pennsylvania Courts apply a contract law analysis").

As quoted above, the Faculty Handbook states that the Defendant will " protect any member of the academic staff against influences, from within or without the University".  In this context, the case of  *Doe v. Univ. of the Scis.*, *supra at* 213 (3d Cir. 2020) is particularly on point: it held that a complaint survived a motion to dismiss when it alleged that pressure and intimidation from a federal agency,  in that case the Department of Education, had induced the defendant to breach its contract, ("[T]his case...differ[s] from garden-variety breach-of-contract disputes involving colleges and universities because of the impact of the 2011 Dear Colleague Letter and colleges' and universities' reactions to it").

In a case also involving Defendant, Pennsylvania's highest court also made clear that the breach of contract claim is available to professor plaintiffs,  *Ferrer v Trustees of the Univ. of Pennsylvania,* 825 A2d 591, 607-608 (Supreme Court Pa. 2002) ("From our perspective, this is a breach of contract case between two parties, in which the issues raised are no different from those the Pennsylvania judiciary has typically adjudicated when presented with allegations of a contract's breach. Although one of the parties to this dispute is an institution of higher learning, we see no need or reason to  devise

special rules"); *Bair v. Shippensburg Univ.,* 280 F. Supp. 2d 357, 365 (M.D. Pa. 2003) (" Plaintiffs' breach of contract claims are well- and plausibly- pleaded under Iqbal and Twombly and should survive the motion to dismiss").

**Point Five**

**THE COMPLAINT STATES A CAUSE OF ACTION FOR CONSPIRACY**

A Section 1985(3) claim for conspiracy to violate First Amendment rights lies when "the State is involved in the conspiracy or... the aim of the conspiracy is to influence the activity of the State", *United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 830 (1983); *Rose v. Guanowsky,* No. 21-3280, 2022 U.S. App. LEXIS 8189, at *3 (3d Cir. Mar. 29, 2022); *Thomas v. Indep. Twp.,* 463 F.3d 285, 298 (3d Cir. 2006); *Suppan v. Dadonna,* 203 F.3d 228, 230 (3d Cir. 2000)*; Phillips v. Trello,* 502 F.2d 1000, 1005 (3d Cir. 1974) ("" [A] private conspiracy to cause unlawful harassment by state enforcement officials which never succeeded to the point where action 'under color of state law' occurred [might] nevertheless cause recoverable damage").  That is precisely the case here; plaintiffs assert that the University is conspiring with the House Committee.

Plaintiff Huda Fakhreddine, as the Amended Complaint alleges in paragraph 6, is  "an Arab American who... has been reviled for her national origin and ethnicity". Paragraph 102 further states that "The House is in fact privileging a minority of the American Jewish population, not only over Arab Americans and all others criticizing Israel or supporting Palestinians-- the House is in fact privileging this militant minority over all Jewish Americans who do not share their views". Dr. Fakhreddine therefore is entitled to assert a Section 1985(3) claim on an entirely separate ground, that she is "the victim of a conspiracy motivated by race discrimination", *Farber v. City of Paterson,* 440 F.3d 131, 138 (3d Cir. 2006); *Bethel v. Jendoco Constr. Corp.,* 570 F.2d 1168, 1173 (3d Cir. 1978); *Abdulhay v. Bethlehem Med. Arts, L.P.,* No. 03-CV-04347, 2004 U.S. Dist. LEXIS 5494, at *32 (E.D. Pa. Mar. 29, 2004) (Arab physician; " [P]laintiffs aver that the object of defendants' conspiracy was to discriminate

against Dr. Abdulhay on the basis of his race, national origin or ethnicity. Accordingly, we conclude that plaintiffs have adequately pled a Section 1985(3) claim").

That Defendant's, and the House Committee's, actions against Dr. Fakhreddine are "invidious" are clearly alleged by the Amended Complaint's citation of the statements at the House Committee's televised hearing by Congresspersons Bank and Wilson, "How are Jewish students in Fakhreddine's classes supposed to receive fair treatment when she endorses hatred?" and why does Dr. Fakhreddine "still have a job at your university" (paragraphs 74-75). "Invidious" discrimination "embodies a gross unfairness that is... inconsistent with the ideals of equal protection", such as "whether the . . . class is defined by an immutable trait that frequently bears no relation to ability to perform or contribute to society and"whether the class has been saddled with unique disabilities because of prejudice or inaccurate stereotypes....But while these factors are those most often considered, no single talisman can define those groups likely to be the target of classifications offensive to the Fourteenth Amendment; experience, not abstract logic, must be the primary guide." *Hassan v. City of N.Y.,* 804 F.3d 277, 301 (3d Cir. 2015) (1985(3) claim sustained against NYPD unit targeting Muslims and Arabs).

Defendant's citation to *McFadden v. Apple Inc.,* 785 F. App'x 86 (3d Cir. 2019) is ill-taken. In that case, the pro se plaintiff only alleged as discriminatory Apple's mandatory (not voluntary) compliance with a search warrant obtained by the FBI. In this case, Plaintiffs allege that the University, under no compulsion, has *chosen* to respond to the House Committee's intimidation and pressure  by turning over Plaintiffs' files  (Amended Complaint, paragraphs 7, 8, 162 and 169). "[A]lleged university overreaction to ….public pressure is relevant to alleging a plausible....discrimination claim", *Doe v. Univ. of the Scis., supra, at* 210. In any event, the Amended Complaint clearly asserts specific conspiratorial and malicious-- in fact, invidious-- behavior by Defendant: "Penn would have been within its rights to protect its community by refusing compliance. Instead, Penn, its trustees off balance and frightened by the accusations of anti-Semitism, announced it would comply with the House

Committee's letter" (Amended Complaint, paragraph 7); "Asked by the House Committee for information that it can distort, twist and misrepresent in an attempt to invoke death threats and hate speech directed at Dr. Fakhreddine, and also to end her career, Penn is voluntarily complying" (paragraph 56); "Penn by disclosing documents to the House Committee is cooperating with, consenting to and co-conspiring with regard to these vicious and dangerous attacks on Plaintiff Fakhreddine" (paragraph 78, 82); "Professors at Penn.... are left wondering whether it is any longer safe to teach courses about the history of colonialism, or to present a nuanced view in a classroom of the history of the Middle East....There has not been such a grotesque limitation on academic freedom since the McCarthy era" (paragraphs 132-133); "[T]he confidential information about members of the academic community disclosed pursuant to the Information Letter by Penn will lead to the immediate doxxing by Canary Mission and other hateful sites of the students and faculty named" (paragraph 136); "Penn [has] already fired and sanctioned members of [its] academic communit[y] based solely on doxxing 'evidence'" (paragraph 150). Plaintiffs have also alleged that they put Defendant on notice that voluntary compliance with the House Committee would harm them, and were disregarded (paragraphs 57, 82).

Plaintiffs' conspiracy cause of action is properly pleaded and should survive the motion to dismiss.

**Point Six**

**THE OTHER CAUSES OF ACTION ALSO ARE PLAUSIBLY PLEADED**

Plaintiff's First Amendment claim asserts that "In an act of retaliation for protected speech, the Committee and Penn are punishing, threatening, censoring, frightening and chilling Plaintiffs for their expression of protected, pro-Palestinian political and moral views. In an act of viewpoint discrimination, the Committee and Penn are privileging, protecting and endorsing pro-Israeli speech in the Penn academic community over pro-Palestinian speech". (Paragraphs 176-177), These assertions,

25

relying on the facts exhaustively asserted above, present all of the elements of First Amendment retaliation, *G.S. v. Penn-Trafford Sch. Dist.,* No. 20-3281, 2023 U.S. App. LEXIS 17611, at *2 (3d Cir. July 12, 2023), and of viewpoint discrimination, *Ctr. for Investigative Reporting v. SEPTA,* 975 F.3d 300, 313 (3d Cir. 2020).

Plaintiffs' Fourteenth Amendment personal privacy claim (Second Cause of Action) is similar to that asserted in *Yarnall v. Phila. Sch. Dist.,* No. 11-3130, 2013 U.S. Dist. LEXIS 48716, at *26 (E.D. Pa. Apr. 4, 2013)  "[T]he information contained in the Plaintiffs' personnel files is intimate and private and within Plaintiffs' reasonable expectations of confidentiality. Plaintiffs' likewise had a reasonable expectation that Defendant would not needlessly share such information with co-workers or for the purpose of harassment. As such, Plaintiffs' allegations against Defendant Ray state a claim for violations of their Fourteenth Amendment right to privacy"); *Brookins v. City of Phila.,* No. 24-470, 2024 U.S. Dist. LEXIS 78244, at *12 (E.D. Pa. Apr. 30, 2024)  ("The Fourteenth Amendment right to privacy shields individuals from unwarranted governmental intrusions into their personal lives [including] the right not to have intimate facts concerning one's life disclosed without one's consent").

Plaintiffs also assert their rights of privacy under the Pennsylvania Constitution (the Third Cause of Action), which include a "comprehensive right to be left alone,...the interest in avoiding disclosure of personal matters and the interest in having independence to make certain kinds of important decisions...("[O]nly a compelling state interest will override one's privacy rights under the Pennsylvania Constitution");", *Allegheny Reprod. Health Ctr. v. Pa. Dep't of Hum. Servs.*, 309 A.3d 808, 889, 901 (Pa. 2024); *Commonwealth v. Sell,* 470 A.2d 457, 467 (Supreme Court Pa. 1983) ("This Court has not hesitated to interpret the Pennsylvania Constitution as affording greater protection...than the federal Constitution").

**Point Seven**

**DEFENDANT IMPROPERLY ASKS THIS COURT TO DECIDE DISPUTED FACT ISSUES**

26

U Penn asks this Court improperly to resolve many disputed fact issues, on this motion, for example, "Penn has responded to some of HEW's information requests and, in doing so, Penn has affirmed its intent to comply with all legal obligations, including the privacy protections guaranteed to students under the Family Educational Rights and Privacy Act ('FERPA')". (Memorandum, p. 3) This is a disguised request that this Court, in dismissing the Complaint, find that U Penn has in fact complied with its privacy duties. In the declaration of Taja Maza submitted with this opposition, Ms. Maza states that viewing of her LinkedIn page by Congressional staff and employees indicate that U Penn disclosed her name-- raising a fact issue. U Penn's counsel then asserts: "In July 2024, HEW demanded that Penn remove redactions, other than those for student names, from its productions. Penn has voluntarily cooperated with this demand, to the extent the request to remove redactions does not conflict with any laws or regulations (such as FERPA)". [26]

Disputed fact issues of course  may not be decided by this Court at the motion to dismiss stage, *Aberle Hosiery Co. v. Am. Arbitration Asso.,* 461 F.2d 1005, 1006 (3d Cir. 1972) ("The motion to dismiss the counterclaim adjudicated nothing more than the existence of a material fact issue as to the existence of an agreement to arbitrate"); *Johnson v. Dunkin' Donuts Franchising L.L.C.*, Civil Action No. 11-1117, 2012 U.S. Dist. LEXIS 69803, at *44 (W.D. Pa. May 18, 2012); *Brady v. Airgas, Inc.*, No. 15-4099, 2015 U.S. Dist. LEXIS 147293, at *12-13 (E.D. Pa. Oct. 30, 2015); *Coulter v. United States, No. 14-30 Erie,* 2015 U.S. Dist. LEXIS 38429, at *8-9 (W.D. Pa. Feb. 13, 2015); *Mucy v. Nagy,* Civil Action No. 20-1950, 2021 U.S. Dist. LEXIS 144654, at *29-30 (W.D. Pa. Aug. 3, 2021).

---

[26] The declaration of Defendant's counsel David Gringer (Document 47-1) sets forth more disputed fact issues: "In Penn's submissions to HEW, Penn has affirmed its intent to comply with all legal obligations, including the privacy protections guaranteed to students under...FERPA.... Penn had, at that point in time, made limited redactions of personally identifiable information, including names, email addresses, phone numbers, and addresses, as well as student education record information in accordance with [FERPA]...  On July 17, 2024, HEW demanded that the University remove redactions other than student names. Penn determined that it would accede to HEW's demand, but only to the extent it does not conflict with any laws or regulations (including FERPA)....Penn has asked that HEW treat its productions confidentially and that it provide Penn with notice and a meaningful opportunity to object in the event the Committee decides to publicly disclose any of the documents..." (Paragraphs 5-8). The Court may note that counsel is testifying, *United States v. Berkeley Heartlab, Inc.,* Civil Action No. 9:14-cv-00230-RMG, 2018 U.S. Dist. LEXIS 6225, at *7 (D.S.C. Jan. 12, 2018).

Defendant in its assertions about harm is adroitly disguising another fact issue as a matter of law; by claiming that Plaintiffs were unharmed by its actions, U Penn is effectively arguing that damages are nominal. But damages are a fact issue which the Court may not decide now, *Graham v. Mohegan Sun at Pocono Downs,* No. 3:14-CV-00908, 2017 U.S. Dist. LEXIS 227664, at *5 (M.D. Pa. July 25, 2017) ("[C]ompensatory damages...are generally considered a fact issue for the jury"). "This Court's role is to determine, as to damages, whether there is a genuine issue for trial", *Keller v. Connaught, Inc.,* CIVIL ACTION NO. 96-177, 1997 U.S. Dist. LEXIS 1251, at *4 (E.D. Pa. Feb. 6, 1997).

To survive a motion to dismiss, even nominal damages are sufficient,[27] *Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist.,* 832 F.3d 469, 472-73 (3d Cir. 2016) ("The District Court granted the District's summary judgment motion, concluding that the Appellants  lack standing.... Because Schaub has standing to seek....nominal damages... we will reverse the District Court's order dismissing her claims").

## CONCLUSION

The motion to dismiss should be denied.

DATED: Amagansett, N.Y.
November 18, 2024

Jonathan Wallace
PO #728
Amagansett, NY 11930
917-359-6234
jonathan.wallace80@gmail.com
Attorney for Plaintiffs
Admittted *pro hac vice*

---

[27].  In Constitutional cases, the prima facie violation is the harm itself, and even nominal financial damages may not be necessary,  *Associated Builders & Contractors W. Pa. v. Cmty. Coll. of Allegheny Cnty.,*  81 F.4th 279, 289 (3d Cir. 2023)