UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA
------------------------------------------------------------x

HUDA FAKHREDDINE,
TROUTT POWELL,  and PENN
FACULTY  FOR JUSTICE IN PALESTINE,

                  Plaintiffs,                  **No. 2:24-cv-01034 (MSG)**

    -against-

THE UNIVERSITY OF PENNSYLVANIA,

                  Defendants,

------------------------------------------------------------x

I, Hilah Kohen, declare as follows:

1.  I am a PhD candidate in Comparative Literature and a Falk Fellow in Jewish Studies at the University of Pennsylvania. My academic work focuses on relationships between literature and language pedagogy. I use literature to ease the process of language learning, and to support my students in thinking critically about how they will use their language learning in the world. I focus on contributing to the health of Jewish language communities, and on supporting language communities that have faced Soviet colonial repression.

2.  The cause of Palestinian liberation is deeply connected with my personal history and my political beliefs. This does not negate the constant internal work necessary for me to take part in this cause. After beginning to question Zionism, the ideology into which I was raised as a child, I began taking part in public marches for Palestinian liberation amid Israel's escalated massacres and oppression in 2021. In the summer of 2023, I began volunteering within anti-Zionist Jewish groups and academic groups in Philadelphia that

1

had assembled to advocate for Palestinian life.

3.  I am Jewish. I was raised in the US by a secular Israeli family; Modern Israeli Hebrew was my first language, and I learned English in daycare. I learned from experience that Zionism is an ideological, not a religious, identity. As I questioned, examined, and ultimately rejected secular Zionism, I became active in my local synagogue, where I particularly treasure opportunities to chant from the Torah and to connect student activists with my congregation. I have observed student activists for Palestine turning to our services for solace after Penn has subjected them to harrowing police violence and injury. This should be a private area of our lives, but it feels necessary to mention given the slander made against our movement, and particularly against the plaintiffs, who are wonderful mentors and colleagues to me and many, many people I know. After hearing a respected member of my synagogue recount how inspirational Huda Fakhreddine's classes have been for him, and after observing intersections between my work and Prof. Fakhreddine's expertise, I recently asked her to chair my own doctoral prospectus committee. I am very grateful that she accepted, and she has been a wise mentor. I do not know whether she is aware that I am writing this affidavit; in any case, the events recounted below are separate from our academic meetings.

4.  I am an anti-Zionist, and I wish to address, briefly, this political position that Penn has targeted for the disclosure of documents. I understand anti-Zionism to be the recognition that modern political Zionism is, in its words and in its actions, an ethnostate project which relies on the systematic destruction of a specific national group's land and life. The state of Israel from its inception to the present has met these criteria, as amply documented by Palestinian people and others (including perpetrators), into the current

2

genocide. Palestinians understand the genocidal nature of Zionism most acutely, but when someone — anyone, of any identity — learns that a state project is built on such systematic oppression, there is only one ethical response: to oppose and resist that project. For me personally, this response is rooted in Holocaust memory. Because Nazis murdered my great-grandparents at Auschwitz-Birkenau, I learned to recognize genocide and genocidal attitudes via Holocaust education from a very young age, and I was horrified to recognize both ingrained in Zionism.

5.  While Penn community members have had to deal with Penn's ignorance, negligence, and hostility toward Palestinian life for many years — particularly if they themselves are from Palestine, Lebanon, or Jordan — I first confronted this hostility myself when I volunteered for the Palestine Writes Literature Festival in September 2023. It was a wonderful cultural event. In an open letter criticizing Penn administrators' defamation of the festival, I and seventy fellow Jewish members of the Penn community wrote that we hoped Penn would support its Palestinian community members and all who join them in solidarity, including anti-Zionist Jewish students like myself. Unfortunately, Penn's determination to discriminate against all of these identity categories has become more and more painfully clear.

6.  Since September 2023, I have observed and experienced how the University of Pennsylvania has repressed and defamed the movement for Palestine, escalating this repression in accordance with increased pressure from donors and politicians. I have seen people of color and Arab members of our community targeted by Penn with special hostility. I have experienced police violence, disciplinary repression, and both threatened and actual breaches of confidentiality at Penn's hands for my participation in protests.

These numerous forms of repression violated Penn's policies regarding policing, discipline, open expression, and confidentiality, which are contractual obligations. These policies include but are not limited to the Open Expression Guidelines (OEG), the Code of Student Conduct (CSC), the Charter of the Disciplinary System ("Charter"), and the Principles of Responsible Conduct ("Principles").

7. Penn's repression also deviated clearly from Penn's responses to protests on other topics, violating the university's own bans on viewpoint discrimination in university actions (in the OEG and CSC). Penn exerted this harm specifically on anti-Zionist protestors, including myself — in my case, for being Jewish in a way that Penn does not like.

8. The harm that Penn has committed to date against the plaintiffs and fellow advocates for Palestine is wildly extensive and varied. It is my understanding that this court has expressed a particular desire to learn how Penn's relationship with congressional pressure has already wrought harm, on top of the further harm it will wreak. I will focus my affidavit toward this end.

9. Rather than protecting the confidentiality of its community members amid congressional pressure to breach our confidentiality, Penn violated our confidentiality and the guarantees of confidentiality it had given us upon our enrollment and employment. These actions by Penn took at least three forms: (a) Penn repeatedly refused, even in communications with students and our advocates, to guarantee the confidentiality of student disciplinary records as mandated by federal law and Penn policy; (b) Penn indicated to students and our advocates that our confidential disciplinary records were being released to the House committee; (c) Penn released confidential student disciplinary records to the House committee. Each of these actions — even (a) alone,

4

even (b) alone — caused extensive harm to Penn and Philadelphia constituencies.

10. I have observed and experienced the harm that Penn caused by these actions. I will focus for now on Penn's harms against graduate student workers like myself and undergraduate students with whom I protested. Beginning in ¶43, I will also detail the harm Penn caused by these actions against witnesses, supporters, and myself during my recent disciplinary hearing.

11. First, Penn established a practice of using its disciplinary system to chill protected protests for Palestinian life and liberation. Those who took part in such protests were and are consistently threatened with disciplinary reports and are often in fact reported for discipline.

12. For example, beginning on November 14, 2023, I took part in the Freedom School for Palestine. The Freedom School was an educational sit-in protest which was in residence in Houston Hall at Penn. This protest created groundbreaking cultural and intellectual programming, provided a space of solace during the day and overnight for students traumatized by the university's hostility toward Palestinians, and pressed the university to make concrete policy changes. On information and belief, the Freedom School for Palestine's sit-in was found to be in full compliance with Penn's policies by the Committee on Open Expression, and Penn representatives affirmed this absence of responsibility for violations during a later hearing.

13. Between November 14, 2023 and December 10, 2023, every night, a delegate for Penn's Vice Provost for University Life (VPUL) stated that VPUL would report each person who stayed in the protest that night to the Center for Community Standards and Accountability (CSA), Penn's disciplinary body. On the initial nights of the protest, Penn

representatives, including police, also repeatedly threatened arrest, although the OEG
(especially section V) adamantly prohibits forced police dispersal of on-campus protests
in such non-emergency circumstances.

14. Penn brought this violative chilling effect to a new climax via Penn's responses to
congressional pressure. On December 7, 2023, Virginia Foxx released a statement which
included clearly stated plans to request disciplinary records from Penn. On December 9,
2023, Elizabeth Magill resigned Penn's presidency. On December 11, 2023, the very next
business day, a Penn representative stated that the threat of CSA referral against the
Freedom School would be actualized that night. This was the first time I realized that the
prior disciplinary threats had been falsehoods, and their sole function had been to chill
protest. I realized that Penn understood the OEG and other contractual obligations to us
as mere levers to disincentivize protests whose content they did not like. I also noticed
that Penn uses the threat of reporting and disclosure of information to cause harm and
chill speech, independently of whether they actualize such threats. The following day,
December 12, fellow protestors and I received our first CSA notice letters, and Penn
made no indication that it would keep these letters and subsequent proceedings
confidential from Congress.

15. Beginning at this juncture, Penn's actions enumerated in ¶7 of this affidavit progressively
built up the following situation. In order to take part in the Freedom School or any
subsequent protest, each of us was forced by Penn not only to take on the risk of unjust
disciplinary reports and sanctions; we now *also* had to face the risk of congressional
exposure, which had already triggered escalated doxxing and harassment of faculty. This
risk of congressional doxxing existed, whether it would be actualized or not, and Penn's

refusal of confidentiality guarantees forced us to take it into account. Penn thus severely exacerbated its use of the disciplinary system to create a chilling effect, and coerced vulnerable Penn community members away from protests in which they passionately wished to participate, and which offered rare mental health protections at an institution that was funding and denying an ongoing genocide.

16. Student protestors who were able to risk discipline but were not able to risk being doxxed by Penn to Congress could no longer take part in protests where VPUL or police were threatening CSA reports, regardless of whether these threats were true or false. Penn forced its community members to choose between exercising their rights to open expression by taking part in protests, and guaranteeing their safety from nationwide harassment by staying away. This coercion violated the obligations Penn makes to its constituents regarding open expression, viewpoint discrimination, confidentiality, respect toward Penn constituencies, and fair process. Penn also forced protestors to spend significant time and energy seeking assurances that, based Penn's legal and contractual obligations, should have been easy to give.

17. Penn has never asked me for my consent to disclose my disciplinary or other records, and I would never consent to such a thing, as I have repeatedly made clear to Penn. I have never been informed about the disclosure of my records, but the congressional report released on October 30, 2024, makes clear that my disciplinary records have been turned over to Congress without my consent, as detailed near the end of this document. Penn's CSC (II.d) mandates that the university produce fair disciplinary processes for students; to ensure this right, the Charter of Penn's disciplinary system ("Charter") explicitly forbids confidentiality breaches. These are contractual obligations that Penn holds to us.

Charter III.F.2 states: "all disciplinary proceedings, the identity of individuals involved in particular disciplinary matters, and all disciplinary files, testimony, and findings are confidential, in accordance with University policies and federal law concerning the confidentiality of student records." Even the reporting of sanctions (e.g., the mere fact of a suspension) is protected by confidentiality amid any possible disclosure "outside the University of Pennsylvania" per Charter III.H. I received no sanction for my participation in three protests, and probation in one — and yet, the October 30 report evidences that Penn turned over disciplinary records regarding my participation in all four protests to Congress.

18. Despite the Freedom School's five weeks of educational programming and extensive efforts to negotiate with Penn administrators on specific policy advancements, Penn's response in meetings with us was characterized by obfuscation, falsehood, and use of the GOE for threats rather than for the protection of our open expression. Penn demonstrated to us that even amid mass atrocities funded by Penn, further protest would be necessary to push for good-faith negotiations, let alone action, on Penn's part.

19. On January 24, 2024, Congress requested confidential student disciplinary records from Penn without a subpoena, and Penn gave no guarantees that it would comply with FERPA by refusing this request. Thus, Penn added yet another layer to its existing chill on protests for Palestine, exacerbating the policy and contractual violations described above and below.

20. On March 1, 2024, I participated in a protest at a meeting of the Penn Board of Trustees to demand concrete policy changes, including endowment transparency and a divestment from companies that enable genocide, such as the genocide in Palestine. This

demonstration was nearly identical to a 2019 protest in which students chanted during a
Penn Board of Trustees meeting to demand divestment from a genocidal industry: fossil
fuels. On information and belief, that protest was met with no police harassment, such
that protestors were able to continue their speech outside the building. Our protest was
significantly smaller due to Penn's chilling effect, but it was otherwise extremely similar.
And yet, we were met with police harassment, including threats of arrest and police
following us. The larger protest in 2019 was met with a letter from the interim provost
stating that he sympathized with the protestors' cause and would not even report them to
CSA. Our smaller protest was met with a March 5, 2024, referral by VPUL (which is
under the provost's office) to CSA, which later resulted in my probation.

21. I had no prior disciplinary record. On March 15, 2024, our first CSA "interview" took
place. These are more accurately called interrogations, as anything students say during
them, and anything other people say during them, is consistently used against respondents
moving forward. Congress had requested disciplinary records from student protests in
full; Penn did not guarantee that our statements in CSA interrogations would not be used
against us by Congress, which had established a record of doxxing. At this stage, Penn's
actions therefore restricted students' ability to safely give our all and say our all in
mounting our defense from discipline. This violated Penn's legal and policy obligation to
provide a fair disciplinary process. It also significantly increased the risk of sanctions,
including sanctions that are reported on transcripts and sanctions that pose threats of
future harm (see ¶22 below).

22. On March 25, I received an outcome letter from CSA assigning one year's probation,
with the threat of suspension if I were "found responsible" of any further violation during

9

probation. Again, an identical protest in 2019 received no sanction at all. For me as a graduate worker, the threat of suspension is a threat to remove my income and access to health insurance.

23. On April 11, following a detailed counterproposal from me, CSA notified me that my probation would be shortened to end on August 9, but that the threat of suspension would not be removed despite the fact that such threats are reserved for another sanction, "Suspension not Imposed" (https://csa.upenn.edu/system/files/private-file-upload/2023/07/sanctions.pdf).

24. CSA brushed aside our repeated observations of viewpoint discrimination between the 2019 and 2024 Board of Trustees protests, even as they acknowledged that the university as a whole is obligated not to discourage protests due to their viewpoint.

25. On April 16, 2024, in an email from myself and another student to CSA, we asked: "In light of the doxxing and harassment of pro-Palestinian Penn community members in Congress, on campus, and online, can you guarantee that you will protect our right for these proceedings to remain private as delineated in the Charter of the Disciplinary System (including sections III.F and II.F.4.c) and the university's policies on the confidentiality of student records and information --- in addition to FERPA and other relevant legal protections that fall under the purview of the Office of General Counsel?"

26. On April 17, 2024, CSA replied to this question as follows: "CSA will follow its normal procedures around privacy." This was a refusal to say "yes." It left the door wide open for disclosures of our confidential disciplinary records to Congress.

27. On April 26, 2024, I signed a letter accepting the probation rather than going to a disciplinary hearing, even though I wholeheartedly disagreed and continue to disagree

with the finding of responsibility and the sanction in that case. I made my disagreement clear, noting that the hearing process poses burdens I could not meet.

28. Specifically, at the time, I was teaching a class that is deeply important to me: Elementary Juhuri. Juhuri is the cherished heritage language of Jewish communities rooted in the Eastern Caucasus; many speakers now live in North America. To my knowledge, the class that I had proposed and designed after years of study with Juhuri leaders represented the first time a North American college or university had offered a Juhuri class. New classes, and introductory language classes, require particularly large time and energy investments from all involved. I was forced to choose between the time investment necessary to serve my students and the time investment necessary to defend myself in a hearing not only from CSA, but from the risks posed by a hostile Congress which could affect me, my ability to teach in peace, and my class.

29. Unfortunately, data publicly released by CSA (https://csa.upenn.edu/system/files/private-file-upload/2024/07/fy-2024-annual-disciplinary-report-final.pdf) makes clear that in 99% of cases where CSA finds responsibility, whatever punishment results from the conglomerate of administration/police/CSA is the punishment that students end up stuck with. Throughout my various outcome letters, CSA upheld the stances of these other parties without any significant critique, enabling their viewpoint discrimination to retain its full impact on us. Other people's testimony on the positive impacts of pro-Palestine protests was not considered in any detail in these letters, even though CSA is supposed to conduct independent investigations and come to its own conclusions. More broadly, Penn representatives' conformity with the views of upper administration often beggared belief or repeated defamatory claims.

30. 99% of students whom CSA finds "responsible" are stuck with their outcome because the disciplinary process is structured in a way that coerces students into plea deals, and away from proceeding to a hearing. Despite this coercion, student protestors for Palestine deeply disagreed with CSA's findings, and many (including me) expressed a desire to challenge these findings in a disciplinary hearing. However, Penn's refusal to guarantee confidentiality meant that the burden of a hearing included the time, energy, and consideration necessary to manage the risk of Penn's breaches to Congress, as detailed below. Penn's refusal to guarantee confidentiality served as a deterrent for students who were otherwise unusually passionate and unusually likely to pursue recourse via disciplinary hearings. This is a coercive force against the fair process and hearing access guaranteed in the CSC and the Charter of the Penn disciplinary system ("Charter"). But Penn's refusal to tell us our records would be protected had another, blunter edge: our acceptance of sanctions could be mischaracterized as guilt by any party to whom Penn yielded our records without our consent. This in itself has been a source of distress for students.

31. As Penn continued to refuse any good-faith engagement with our basic moral demands regarding divestment from genocide, I took part in the Gaza Solidarity Encampment. I was deeply touched and impressed by the encampment's development of mutual care, education, culture, health and safety and nutritional infrastructure, religious practice (including Shabbat and Passover services that I coordinated with students and rabbis), and many other features of thriving community life. I was also astounded at the brilliance and generosity of students and faculty who negotiated with administrators on detailed demands, only to be met with equally astounding bad faith from administrators. Despite

all this, I was identified and reported for discipline by VPUL due to my prior activism for Palestine (another instance of discrimination). I was arrested in a violent May 10 sweep by Penn and Philadelphia police, and I was reported for discipline again by police as a result. All of the penalties against me that were proposed in these processes were ultimately dismissed in full.

32. On information and belief, CSA informed fellow student participants in the encampment that protestors' disciplinary records were being sent to counsel, to be reviewed and/or redacted for release to the House committee. Unique academic and personal details, and my communications with local press about multiple protests, make it very easy to identify me by my files even if redacted (the allegations made in these files and by Congress are dangerous and defamatory, unlike anything I have stated to the press). All protests and all statements to Penn disciplinary and other representatives had already been chilled and damaged by Penn's lack of confidentiality guarantees. Now, this damage was further exacerbated, because there was a positive assurance of confidentiality violations.

33. Penn had demonstrated to us that even a massive, thriving community encampment with extensive negotiations could not lead them to consider our demands in good faith, including our demands for divestment from genocide. On May 17, 2024, in an effort to push Penn administrators back to the negotiating table and re-establish the rich educational and cultural haven which Penn had violently demolished, I took part in a protest to establish a new sit-in remembering Prof. Refaat Alareer, who was murdered by Israel; we renamed Fisher-Bennett Hall for him. Fellow protestors and I experienced new levels of police violence during this protest. This placed the even greater police violence that Philadelphia residents regularly face into new perspective for me. I was jailed for 22

hours, preventing me from attending Shabbat services, before I was released without any charges. All of this was in blatant contravention of the Guidelines on Open Expression, section V (especially V.B.3 and V.C.3-4), which forbid and condemn violent police dispersal of on-campus protests, especially as a first resort.

34. A mandatory leave of absence (MLOA) forced on me by VPUL was sent to my email while I was still in a jail cell, even though MLOA policy states that the student in question should be provided with an opportunity to be heard before a MLOA is instituted.

35. On May 18, I received a CSA notice letter regarding the Refaat Alareer Hall protest, which included a wide range of sensational allegations, even as CSA acknowledged they had no evidence linking that range of allegations to me personally. On May 22, I received a new CSA notice letter combining the previous three.

36. On June 3, 2024, my third CSA interrogation, concerning Refaat Alareer Hall, took place. CSA reiterated their belief that the confidentiality of disciplinary proceedings, including hearings, is important in the abstract, but gave no actual or concrete assurance regarding the turnover of confidential records to Congress.

37. Following an extensive counterproposal process, on August 11, 2024, I asked to proceed to a hearing. I had finished teaching my course, and I have access to extraordinary safety nets and community support systems. I was also prepared to meet any absurd allegations of antisemitism with my own experience of Jewish community-building and of academic work in Jewish Studies. The hearing I was able to access by sheer luck and privilege has been our entire university community's only opportunity to receive binding, independent judgment regarding whether protestors in the encampment and Refaat Alareer Hall should or should not be robbed of their educational opportunities and access to

necessities like income and health insurance.

38. Unfortunately, when I was finally able to access this disciplinary hearing despite Penn's coercive measures to the contrary, numerous parties — both protestors and individuals who contributed to my defense, as well as myself — suffered harm due to Penn's actions enumerated in ¶7 above.

39. On August 30, 2024, Penn representatives received an email from my faculty advisor for the disciplinary process (who is not my doctoral advisor) which included this question: "How confidential are the records of the hearing? For example, will they be released to the Congressional Committee that is investigating Penn faculty and students currently?"

40. On September 2, 2024, a Penn representative responded as follows: "Records of the hearing are handled in according [sic] with the University Confidentiality of Student Records Policy, found at  https://catalog.upenn.edu/pennbook/confidentiality-student-records/.  If you have additional questions regarding this policy or how the university is complying with this policy, please direct them to Ms. Brenda Fraser of the Office of the General Counsel https://ogc.upenn.edu/. Any request for the release of records is outside of the purview of [this Penn representative]."

41. I was advised by my attorney that this was not actionable advice, as I should never contact opposing counsel. I also noted that this response contained no assurance that my records would be kept from Congress, even in the absence of a subpoena. I was forced to act based on the only statement students had received prior on this matter: that Penn was indeed reviewing all of our records for release to Congress, and all of my hearing records might be released.

42. On September 3, 2024, Penn sent me an official hearing notification and hearing

protocol. On September 5, 2024, a Penn representative indicated to me via email that unless I requested otherwise by 5 PM on September 9, my hearing would be a closed hearing by default. I did not request an open hearing.

43. My hearing took place on the following dates: September 19-20, 2024 (all proceedings were initially scheduled for these two days); September 27, 2024, which had to be scheduled ad hoc on September 20; and October 18, 2024, which had to be scheduled ad hoc following September 27.

44. During the hearing, Penn representatives acknowledged numerous times that the confidentiality of the hearing record should be considered important. They emphasized the existence and importance of FERPA, and its applicability to them and to Penn. And yet none of them guaranteed that my confidential hearing records would not be turned over to Congress. One even stated, "I also fear the Congress thing." This aligned with prior acknowledgment by Penn representatives that Penn was reviewing our disciplinary records for release.

45. A witness for the respondent described how Penn had breached student and faculty negotiators' confidentiality without consent during encampment negotiations. Nobody in the room disputed this testimony. Thus, there was a further shared awareness of Penn's established pattern of confidentiality breaches and the risk of further breaches.

46. During the hearing, I pointed to a testimonial from a faculty member that was in evidence. When introducing this exhibit, I stated: "Our attorney and students have been told that Penn is turning documents over to Congress without permission and without a subpoena. Congress has already used it to produce an environment that enables death threats to professors." The faculty member's testimonial noted that when Penn

representatives were asked by both students and faculty whether students' FERPA rights would be protected, they were not able to say "yes." They did not even say "yes" even when asked whether students who complied with administrative requests would be protected from breaches, even though this behavior grants additional protections from being subject to the disciplinary process. The testimonial made clear that this looming threat of disclosure by Penn, not its actualization, has already destroyed the integrity of the disciplinary system and altered the status of students in that system in a fundamental way, even according to officials involved in the process. Nobody present in the disciplinary hearing disputed this testimonial.

47. *The simple fact of Penn's refusal to guarantee the confidentiality of disciplinary records, independent of any actual breaches, harmed me and others during my disciplinary hearing.*

48. Before describing some of these harms, I will clarify that my hearing records include more than 24 hours of video and audio, with extensive details about my political and religious life and that of others. They also include extensive exhibits, which give details about myself and others. Congress has explicitly requested all of our disciplinary records, and Penn has indicated compliance. There is no way to redact my hearing recordings in a way that would safeguard my identity from congresspeople and their aides.

49. The threat of Penn breaching confidentiality constrained me and the witnesses for the respondent during the hearing process. In a closed hearing such as mine, the statements made by the defense/respondent are supposed to serve one purpose only: to further the protection of the respondent from unjust punishment by clarifying both facts and rules. In a fair process, this has to be the respondent's one and only point of focus. A fair process

is supposed to be guaranteed by Penn's CSC and Charter.

50. In my hearing, I could not rest assured that confidential records would remain confidential. There was no such guarantee, and there was precedent for confidentiality breaches by Penn to Congress. So I knew that everything I said, everything that was said to me, everything my or their witnesses said, could end up on a national stage, in the hands of the very people who repeatedly vote to spend billions of our taxpayer dollars on annihilating Palestinian life and, increasingly, Lebanese life. These people had already shown a great willingness to distort, mislead, and cherry-pick, and to repeat falsehoods about us and our protests, and to name people such that mass harassment ensued against them.

51. When I began preparing my defense, numerous witnesses indicated that they did not feel safe testifying live, or that they did not feel safe putting their names to written testimony, specifically because of Penn's record of breaching confidentiality in Congressional contexts, which would put them at risk of being doxxed, losing jobs and job opportunities, and being stalked and threatened and harassed. Several witnesses indicated in writing in their anonymous testimonials that Penn's confidentiality breaches were the reason for their anonymity, which made their testimonies significantly less powerful than they would have been otherwise and required me to spend time and effort merely defending their inclusion. Penn's decision to turn over disciplinary records without a subpoena, and even just Penn's refusal to guarantee that no such breach would take place, thus became an advantage for the university's prosecutorial bodies in a student disciplinary hearing, and an artificial disadvantage for the student — a violation of Penn's contractual obligation to provide a fair disciplinary process as per the Code of

Student Conduct (section II.d).

52. Even just fielding and discussing questions from people who wanted to defend me and making sure everyone was on the same page about the looming threat of Penn's disclosure to Congress required significant amounts of time and energy from me and others. I needed every ounce of that time and energy to meet deadlines for witnesses and evidence in my case — especially since Penn had a team of full-time employees handling their case, while I had to handle mine in time that was free from other obligations. These deadlines, despite my best efforts and support systems, created by far the greatest time pressure and forced lack of attention to my own health that I have ever experienced in the academic sector of my career. Again, Penn had put my livelihood at stake in this hearing.

53. When offering hearing panelists contextual information about myself and about specific protests, I was severely constrained in what I could safely say. Penn's prior confidentiality breaches and refusal to guarantee that no further breaches would take place created a chilling effect on testimony for me, the respondent. For example, to ensure that no one else would be put at risk of congressional doxxing, I had to be less specific about the benefits and the programming of the encampment, which damaged the case in my defense. I also had to take the time and effort to find alternative descriptions which were inevitably less effective.

54. In other situations during the hearing, Penn's refusal to protect confidentiality coerced me into engaging in discourse for the sake of defending people from Congress, even though my engagement in that discourse damaged my position in the eyes of the hearing panel.

55. For example, Penn officials went out of their way to raise dangerously defamatory claims about myself and others that were patently irrelevant to my case, but which posed a risk

of congressional retaliation, and which I was therefore ethically obligated to counter.

56. During my hearing sessions, completely unprompted, a Penn official stated the full name of a Philadelphia community activist and slandered the activist, despite defamatory information about this activist having been stricken from the record prior to the beginning of the hearing. We had spent significant time and effort demonstrating the unreliability of this information so that it could be stricken. I attempted to explain this situation to the hearing panel, telling them that now this person whom the police have already attempted to target will have their name in front of a hostile Congress. I also acted on my ethical and community obligation to explain the incredibly warm and supportive role the individual had played toward student and community organizers. Nobody present in the hearing room disputed the risk against this individual from Penn's potential disclosure of records to Congress, including the multiple Penn officials in the room. In fact, Penn representatives attempted to prevent me from speaking about this topic, repeatedly interrupting me and claiming the issue was irrelevant because the evidence had been struck. I tried, amid the interruptions, to squeeze in the information that the whole affair made clear the lack of credibility in the case against me. This was a stressful experience, and the behavior of Penn representatives communicated to the hearing a potential lack of focus or credibility on my part which was false, but which damaged my position in the eyes of the hearing.

57. This is not the only example of such defamatory conduct that damaged me and others. Many times, Penn officials rested their arguments that the protests should be met with disciplinary sanctions in part on claims that protestors held socialist or anti-fascist views. This was obviously violative of the Student Code of Conduct and Guidelines on Open

Expression, which explicitly prohibit discipline based on views expressed. However, many congresspeople are notoriously hostile to socialist and anti-fascist movements. Penn officials were defaming me and fellow protestors, which could then go to Congress, which would happily take it up and call me a convicted Antifa terrorist or something similarly false. This imposed a psychological burden because congresspeople had already falsely called Prof. Fakhreddine an antisemite.

58. All these and numerous other consequences of Penn's confidentiality breaches made the hearing process longer, more damaging psychologically to me and my witnesses, and way more inhibiting of my ability to work effectively during the months that it took to resolve my case. Sure, we won, but so much damage to my witnesses, fellow protestors, and me was already done.

59. On October 18, 2024, the finding in my case was given. I was found "not responsible" on all three charges. The finding included observations that the Gaza Solidarity Encampment should serve as a model of open expression for the university; its level of care, preparation, education, and community guidelines was found to be impressive. The finding placed full responsibility for arrests at the encampment on the university for its bad-faith handling of the protest. With regard to Refaat Alareer Hall, the university was found responsible for violating its own policies.

60. As of November 18, the detailed report on my hearing is forthcoming.

61. Penn's actual disclosures of confidential information enabled the congressional report released October 30 to cause harm to fellow student protestors and myself. The report evidenced the actual turnover of our confidential records to Congress — further concrete evidence that Penn had violated its obligations to us. The report included references to

my own confidential disciplinary records that were both detailed and defamatory. For example, a direct quotation of a statement made in my file by someone else was misattributed to me in ways that defame my character. Other students were also defamed individually. On top of this, we must live with the knowledge that we could be doxxed by name when Congress returns to its grandstanding.

62. Beyond individual defamation, the report smears all participants in the protests at hand as antisemitic. This is offensive, defamatory, and threatening to people's livelihoods and relationships in all cases — especially in the cases of Palestinian and Lebanese students and faculty who often have to hear these tired allegations solely because of their identities. I do not face them as often, but I still do. There is a particular flavor of absurdity to it in my case, especially since these allegations come from non-Jewish politicians who are allied with white and Christian supremacists. Many students who have attended services with me at synagogue and at protests — including a student who washed my congregation's dishes without expecting thanks or recognition the day after police injured her — had their confidential records cited in this report, and were smeared with this absurd allegation of antisemitism.

63. Relatedly, my disciplinary records make eminently clear that I am Jewish, and they also name my Israeli background. My records describe my contributions to Jewish community and Jewish studies. Other students' disciplinary records make clear that they are Jewish. Emails sent between students and administrators make clear the significant Jewish presence in protests for Palestine at Penn. I believe Congress had access to this information. The October 30 report's concerted erasure of these facts contributes to its defamatory nature, and contributes to its efforts to defame faculty like Prof. Fakhreddine

by erasing Jewish support for them and their advocacy.

64. Finally, the intervention of this court is necessary in this case to check Penn's rampant violative actions. To avoid giving the court a document the length of my eventual doctoral dissertation, I will give a very limited summary of this necessity.

65. Penn's motion to dismiss in this case claims that federal courts should stay out of how universities balance academic freedom and safety, even as the same motion acknowledges that these issues are important. This is an extremely broad and dangerous statement: it warns federal courts to stay out of *any* matter pertaining to Penn's persecution of Palestinians and their allies. It is essential that the legal system serve as a check on Penn's abuses of power and breaches of confidentiality — first because Penn has repeatedly demonstrated itself to be a negligent and malicious actor toward Palestinians and their advocates (as evidenced throughout this document), and second because Penn has been wildly ham-fisted with *legal* matters and *legal* rights. The *legal* expertise of the court system is a necessary check on Penn.

66. During my disciplinary proceedings, various Penn representatives and actors made vague allegations that I had broken the law during on-campus protests. Because the Code of Student Conduct (III.j) tells students "to comply with federal, state and local laws," Penn was using these allegations to assert that I should be found responsible for, and sanctioned for, a disciplinary violation. But when they made these allegations of lawbreaking, they did not even cite specific legal statutes by number (beyond assertions such as repeating the phrase "disorderly conduct"), let alone give specific evidence of such statutes being violated. Penn officials even consistently confused code violation notices with criminal proceedings, asserting that I and other students had been criminally

charged when we had received the rough equivalent of a traffic ticket, and even this was dismissed. And again, ultimately, I am here with zero legal citations or charges against me for the protests at hand. Penn has demonstrated that it is willfully incompetent when it comes to falsely saying student activists broke laws. The only explanations are bias and the fact that such false allegations meet Congress's cries for punishment. Most students are forced to accept sanctions which damage their livelihoods, and which CSA bases in part or in full on these false allegations.

67. Policing is another node where Penn often intersects with the legal system and has abused legal power in order to cause us harm. Penn police and Philadelphia police have very much merged in their violent responses to our protests, with Penn summoning Philadelphia PD. The May 10 arrests, the May 17 arrests and jailings, and other severely harmful police actions were all collaborations between Penn and Philadelphia PD, and Philadelphia PD is a government entity subject to the First Amendment. Further, in all of its CSA findings against me (and many other student protestors), Penn has relied in part or in full on police. I have repeatedly made clear in interactions with CSA that CSA (and Penn writ large) is obligated not to act on police reports that are clearly discriminating against protests for Palestine as per the content-neutrality provisions of the GOE and CSC, and Penn has always ignored this point. I have also made clear, especially in my hearing, that the GOE prohibits police from being the party that responds to on-campus protests (section V, especially V.B.3 and V.C.3-4), and Penn representatives also did everything they could to ignore and skirt this; the hearing panel was able to correct this in my case, but not in others.

68. Immediately after the hearing panel announced their finding of no responsibility in my

case, Penn disciplinary representatives *themselves* said that the hearing outcome constituted "due process" at work, saying "this is what our charter is about." They thus made clear that access to recourse beyond CSA's own investigations is necessary for due process and compliance with the disciplinary charter. As detailed above, CSA's report makes clear that 99% of the time, students are coerced out of proceeding to a hearing. The only other recourse we have is the courts.

69. The University of Pennsylvania has caused extensive harm to fellow protest participants and to me. The harm it has caused to everyone in Palestine and Lebanon is incomparably, unfathomably greater. We seek redress for the harm done to us through the courts. Penn caused harm not only by actually turning over our records to Congress and permitting the defamatory statements made in Congress's October 30 report, which caused students, staff, and faculty further stress and moral harm. Penn also caused harm simply by neglecting and refusing to guarantee the confidentiality of disciplinary records, confirming that records were being reviewed for release, and creating a situation of ambiguity around whether records would be turned over to Congress or not. This ambiguity damaged every person who had to add this consideration to their navigation of on-campus speech and the disciplinary process, it damaged every person who could not defend themselves in full from the material harm of sanctions, it damaged every person who had to carry the stress burdens Penn imposed, and it damaged all who contributed to my defense in my hearing.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 18, 2024

/s/ Hilah Kohen
Hilah Kohen