UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA
------------------------------------------------------------x

HUDA FAKHREDDINE,
TROUTT POWELL,  and PENN
FACULTY  FOR JUSTICE IN PALESTINE,

                            Plaintiffs,                        No. 2:24-cv-01034 (MSG)

  -againt-

THE UNIVERSITY OF PENNSYLVANIA,

                            Defendants,

------------------------------------------------------------x

                      DECLARATION OF TAJA MAZA

    I,  Taja Maza, declare as follows:

1. My name is Taja Mazaj, I am a recent Penn alum in the College of Arts and Sciences. During my time as a student in Political Science and English, I have focused much of my studies on social movement theory and history, including struggles for justice and liberation. I have always viewed my activism as being intimately connected to my academic pursuits. Academic scholarship exists in the service of justice and progress, and I recognize that without my activism and involvement in my community, my academic career and my time at Penn would have no teeth.

2. The University of Pennsylvania has a long history of displacing Black families, gentrifying West Philadelphia, investing in apartheid and warmongering, exploiting its workers, cheating Philly's public schools, conducting unethical experiments, stealing and hiding the remains of children, using its police force to brutalize protesters; and the list goes on. Penn's power and status has long

shielded it from any form of accountability or justice for the communities it has harmed. When the most recent genocide in Palestine began, Penn was already manufacturing consent for genocide by attempting to shut down the Palestine Writes arts & literature festival. For years, discussion of anti-Zionism and Palestinian liberation was treated as a taboo on campus. This past year is only another mark on Penn's timeline of limiting speech in order to preserve their power and image, their violence and repression against student activists increasing in tandem with Israel's continued violence and repression in Palestine. I joined Palestine solidarity organizing because I believe in justice and liberation for Palestine and beyond, and as a person of conscience I believe it is our duty to resist state violence, apartheid, genocide, and fascism wherever it may be. I also saw the capacity for change within my university, which was now aiding and abetting a genocide. The University of Pennsylvania is not just an academic institution, but an economic superpower with a concerning amount of power and capacity for exploitation, both within and beyond Philadelphia. So while I entered activism in good faith, Penn has made it beyond clear that they have no qualms about participating in a genocide, and will in fact sacrifice the safety of their own students and faculty to continue doing so.

3. Though I am not a plaintiff in this case or a member of the group plaintiff, Faculty for Justice in Palestine, based on conversations with others in simuilar positions, I can state that my experience is common to undergraduate, graduate students and postdocs at U Penn, including graduate student members of FJP.

4. I am writing to acquaint this Court with the sinister, overwhelming effect on my studies and daily life, continuing past graduation, of U Penn's voluntary compliance with the House Committee, but in order to do so, I must first give this Court some background about the University's interaction with students critical orf Isreal and supporting the Palestinian people.

5. My first case with U Penn's disciplinary office ("CSA") was opened due to my

participation in the Freedom School for Palestine, a sit-in in the Reading Room of Houston Hall in December 2023. I was informed that I would be charged separately with a student disciplinary infraction for each night that I stayed in the Reading Room past closing time (12:00am). While members of the Vice Provost's office and recognized Open Expression Observers were frequently present, Penn Police officers conducted ID checks, either by recording the physical IDs through their body cameras, or writing our names on paper.

6. On the first day of "reading days," myself and other members of the Freedom School met with Karu Kozuma, the Vice Provost for University Life. Kozuma informed us that the Vice Provost's office did not actually intend to give us CSA cases for the first four weeks of the sit-in — even though it was mutually understood that this was the case. He went on to state that because reading days had begun, CSA cases would begin. Because there was no clause within Penn's Guidelines on Open Expression which banned demonstrations from taking place during Reading Days, I understood this as an arbitrary and punitive measure to dismantle the sit-in before winter break, especially as the House Committee hearing had taken place just a few days earlier, and public scrutiny around the University's response to Palestine solidarity protests was ramping up.

7. On December 19th, Kozuma met with members of the Freedom School again, notifying us that if we dismantled the sit-in that day, all of our CSA cases would be withdrawn. If we did not leave, we would be arrested by the Penn Police. We dismantled the sit-in, and I received communication from Kenneth Leichter with the Center for Community Standards and Accountability that my CSA referral

was withdrawn by the Vice Provost for University Life. The University's use of conduct referrals to threaten their students made it evident that University leadership saw disciplinary referrals as a lever they could pull, rather than a structural and investigative process to look into potential violations of conduct.

8. On February 19th, 2024, I participated in a study-in in Van Pelt Library to bring attention to Israel's educide in Palestine. The entirely silent demonstration lasted eight hours, and had over 20 participants throughout the day. Numerous armed Penn Police officers entered the library, and two plainclothes officers remained just outside of the room throughout the day. Penn Police entered before any recognized delegates of the VPUL's office, who only arrived around 7 pm. After speaking with administration, we decided to end the demonstration and move into the library's basement to continue studying as a group of friends, without posters and banners. Library officials were immediately notified, and Tamara King from VPUL followed us down to the basement to inform us that we had been banned from using the library for the remainder of the day.

9. Despite complying with their request to end the demonstration to prevent referral to CSA, on February 22nd, I received notice from CSA that my actions might have been in violation of student conduct, and I would have to meet with the disciplinary board. During my initial group interview with CSA, myself and others stressed that there is nothing within the Open Expression Guidelines that we could have violated. Throughout the interview, Danielle Crowl and Kenneth Leichter repeated that students had reported our demonstration to administrators, stating that they felt uncomfortable by our presence. The initial report stressed

these reports. A number of students were identified because another student had taken a photo of their face and shown the photo to police and security guards. This incident of institutional doxxing was raised to the disciplinary board, especially in the context of the University not taking reports of doxxing seriously and not taking action to prevent doxxing. Both Crowl and Leichter stressed that there were many people within the University who have been made uncomfortable by our First Amendment-protected political expressions, and they had to take those concerns seriously. They insinuated that the personal beliefs of those who existed outside of University administration and the disciplinary process were held in the same regard as the code of conduct itself. Furthermore, while over 20 students participated in the study-in, only five were reported to the disciplinary board. These people, including myself, had been extremely visible members of protests in the past few months. As a liaison, I was frequently interfacing with administrators and police. When Tamara King arrived at the study-in, she walked directly to me and stated, "I know who you are, you know who I am, you have three minutes to leave." This comment is a frightening and threatening example of how administrators have been empowered to bypass established institutional procedures (for instance, informing students of their conduct violation upon arrival, giving them an opportunity to leave, and conducting ID checks if they do not comply with administrative orders). This institutional doxxing has made me feel unsafe both on and outside of my own campus. The University has created an environment of extrajudicial intimidation and punishment, where students who disagree with our political speech and action

are empowered to weaponize institutional channels against other students and can be assured that the University will retaliate in a significant way. I was placed on probation for this action.

10. On March 1st, I participated in a demonstration at the University's Board of Trustees meeting along with a handful of other students. We left the meeting after Penn Police threatened to make arrests. Throughout the demonstration, numerous Trustees recorded us on their cellphones. After we had left the premises and were waiting on the sidewalk outside, an incensed man who had been in the meeting videotaped our faces and threatened that we would never be able to find employment again. Fearing for our safety, we gathered in the lobby of a nearby academic building so we could speak to each other. A Penn Police officer on bike patrol noticed us sitting inside of the building, and reported our presence on the radio. He entered the building, attempting to barricade us between the tables we were seated at and his bike, and continued speaking into his radio without personally acknowledging us. Fearing for our own safety, we all departed campus. Throughout the 10-minute walk, almost five Penn Police officers followed us on foot and bike to 40th and Locust.

11. On March 5th, I received notice from CSA that my actions might have been in violation of the code of conduct. After the initial interview, the disciplinary board resolved my case. In 2019, student group Fossil Free Penn participated in an action at a Board of Trustees meeting that was no different than the March 1st disruption, apart from the political views expressed. They received only a warning from the Vice Provost at the time, Wendell Pritchett. No formal disciplinary case

was ever opened against these students.

12. By the way, the Penn administration's continued decision to involve police officers in disciplinary matters has resulted in significant mental trauma for me. Around a week after the trustees demonstration, an off-duty Penn Police officer who was present at the previous study-in tapped me on the shoulder as I was standing in line at a coffee shop near campus, saying "Hello, how are you?" When I did not respond, he asked incredulously if I recognized him.

13. During my initial CSA interview, I repeatedly asked the disciplinary board if they intended to hand over student records to Congress, which records and communications were to be handed over, and if these records would be properly redacted in line with FERPA regulations. The disciplinary board did not directly answer my questions and merely stated that they "respected" FERPA and would do their "best" to follow it. They did not inform me if my name and identifying details would be redacted either within the University (i.e., the Office of Government Affairs and Penn's General Counsel), or once passed onto Congress. I now believe, as I wil ldemonstrate below, that not only did U Penn turn my discipliary records over voluntarily to the House Committeer, that my name was not redacted-- and therefoire, my FERPA rights were grossly violated.

14. On May 13th, 2024, I received another communication from CSA that my arrest during the encampment sweep was a violation of the disciplinary code. During this initial meeting, I asked again if they intended to send over disciplinary records to Congress. I was already aware that Penn administrators had provided a list of faculty and student contacts for the encampment to city officials. While I

did not know if my name was on this list, I was worried that Penn would not take my concerns of privacy seriously. Danielle Crowl, who is staff for CSA, informed me that while they intended to redact names, Congress had requested sweeping records from within the University, and that everything related to "antisemitism" — including my case — was to be handed over. Nothing within my disciplinary case mentioned, or was related to, antisemitism. Crowl and Lechelle Scott, another disciplinary official present during the meeting, repeatedly made claims that this incident was both a conduct matter and a criminal matter, even though I had not been charged with any crime.

15. I felt I was unable to adequately defend myself or communicate with University officials under fear that everything I said would be passed over to Congress, putting me under further scrutiny not just with the administration and their police force, but by unscrupuloius national politician speaking from one of the most powerful institutions in the country. Even though I repeatedly expressed my interest in continuing the disciplinary process — including submitting a counterproposal and potentially advancing to a hearing — I was actively discouraged from seeking recourse that was established for students to defend themselves against unjust punishment. Danielle Crowl stated that I would not be able to graduate on time, and my diploma would be withheld — putting me under punitive measures simply for seeking my right to due process within the University. I was also highly aware of the fact that the University had already proven itself to be untrustworthy in its handling of student records and institutional doxxing, and that any further communication with the disciplinary

office would be included in the Congressional report. I ultimately accepted sanctions of retroactive probation, which placed a permanent mark on my transcript.

16. Even though my disciplinary case was resolved, I noticed shortly after that I was continuing to receive extrajudicial punishment for my participation in the encampment. On May 20th, I attempted to enter the University's Commencement ceremony for the class of 2024 (my own graduation). I was told by workers present that there was an issue with my Penn Card, and upon further questioning, a worker at the event informed me that I was on a "list" of students who were to be barred entry from the event. They did not provide any reasoning as to why. I was aware of multiple other students with open disciplinary cases who were allowed into the Commencement ceremony without problem.

17. I approached Katie Bonner, who was present at the event, and asked why I was being denied entry, and what "list" I was on. She denied knowing anything, and called Karu Kozuma, the VPUL. After a brief five-minute phone call, Bonner informed me that Kozuma was willing to give me clearance to attend the event, even though I was informally barred.

18. Shortly after, I noticed that my PennCard, which was set to expire at the end of August 2024, no longer worked. I was barred from libraries, academic buildings, gyms, dining halls, and dormitories. I had received no communication from the University about this, nor was it mentioned during disciplinary proceedings. I called the PennCard support office, and they were unaware of any deactivation. I then reached out to the Department of Public Safety's support line over the phone.

A worker there told me that my PennCard was indeed deactivated, but he had received no notice about the deactivation, and no reasoning behind it. He expressed his confusion, stating that he was the only one present in the office when my PennCard was deactivated, and he did not authorize the deactivation. I then reached out to Paige Wigginton, the Director of Special Services within the Department of Public Safety, via email on May 23rd, 2024. She informed me that the "deactivation by Public Safety was triggered by the ongoing criminal and conduct matter related to your actions on May 10, 2024. As with other students in similar circumstances, we spoke to evaluate access needs and you shared that your only remaining business with the university is the conduct matter which can be completed remotely or by signing in at the Center for Community Standards and Accountability at 3440 Market Street if in person." I had no open criminal matter whatsoever, and I had never spoken to anyone in the Department of Public Safety or otherwise about my access needs, both of which I had communicated to her in an email on May 23rd. I never received follow-up from Wigginton, DPS, or administration, and my PennCard remained deactivated for the rest of my time at Penn.

19. On November 2nd 2024, two days after the Congressional report was made public, I noticed that I had received eight profile searches on Linkedin. These searches originated from people employed by the U.S/ House of Representatives and the U.S. Senate. Months prior, I had deactivated my Linkedin out of concern for doxxing, especially because doxxing websites like Canary Mission — which I was aware was used by my fellow Penn students to dox their peers — often

publicized students' Linkedin accounts and harassed former and current employers. Deactivating my account was an active hindrance to finding and applying to jobs. However, as a recent graduate on the job market, I decided to reactivate my Linkedin account. Receiving notice that my name, profile, employment history, and schools were being searched by Congressional staffers was frightening and extremely concerning, especially because I am still unaware of the extent of materials Penn has submitted to Congress. In order for so many Congeressional employees to copme looking for mwe, I am certain that U penn either dfisclosed my name to the House Committeem, or information sufficient to identify me-- and probably the former.

20. Because of the Penn administration, Penn donors and trustees, and the Penn police force, I have felt consistently unsafe on my own campus. Now, the University's total and eager compliance with Congressional record requests has made me afraid to maintain any public presence, even on a job-seeking platform. U Penn's disregard for student safety is beyond evident, and it is also clear that their own internal disciplinary and investigatory processes are mired and misshapen by political pressure and collusion with Congress and with the police in disciplinary matters. While Penn claims they have an "earnest commitment to ensuring that all members of its community are safe and can participate in university life," they have consistently violated the same principles they claim to uphold. I have been blocked from participating in University life, my educational, physical, and mental safety has been put at risk, and I have been prevented from seeking due process within the University. After failing to protect their students and faculty,

their students' and faculty's protected speech, and failing to follow their own internal guidelines and policies, it is clear that Penn is ill-equipped to handle these issues on their own.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 18, 2024

<u>/s/ Taja Maza</u><br>
Taja Maza